354 A.2d 875

**COMMONWEALTH of Pennsylvania**

v.

**Gregory L. GEE, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 20, 1975.

Decided April 7, 1976.

128

James J. Binns, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Deborah Glass, Philadelphia, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

EAGEN, Justice.

The appellant, Gregory Gee, was convicted by a jury of murder in the second degree. Following the denial of post-trial motions, a prison sentence of five to fifteen years was imposed. This direct appeal followed.

The prosecution emanated from the fatal stabbing of Glenn Cook, seventeen years of age, outside Overbrook High School in Philadelphia in an atmosphere of hostility between two rival youth gangs, the Moon Gang, most of whose members attended Overbrook, and the June Street Gang, most of whose members attended University High School. Cook, a former student at Overbrook, was on his lunch hour and had accompanied his sixteen-year-old cousin, Tyrone Cook, a student at Overbrook, to the school.

Shortly after the stabbing, Gee, a member of and an officer in the June Street Gang, was taken into police custody and during the questioning that followed admitted he stabbed Cook. However, he explained that when he visited Overbrook that day—it was his day off from work—he heard from friends that "something had kicked with the Moon." At his point, Gee said, about

forty members of the Moon Gang came out of the school, and Glenn Cook, whom he knew to be a member of the Moon, swung at him three times with a cane but missed each time, and in defense he stabbed Cook once with a knife and then ran.[1] He further indicated he carried the knife for self-protection because he himself had once been stabbed. Evidence of Gee's custodial statements was admitted into evidence at trial.

The only eyewitness to the occurrence who testified at trial for the Commonwealth was one Steven Lambert, then a student at Overbrook. He stated he was fifteen feet away from Cook and that Cook was standing alone, unarmed and leaning against the front wall of the school building when he was attacked by Gee. He said Gee ran down the front steps of the building, threw his coat onto an automobile upon which other members of the June Street Gang were sitting, approached Cook, shouted "Yeah, You from the Moon Gang" and stabbed him in the chest near the heart. Lambert said Cook then grabbed his chest and tried to run, and Gee followed him still swinging his knife.[2]

 Much of this appeal is based on statements made by various eyewitnesses to the incident which appellant contends he was improperly precluded from making adequate use of at his trial and which he describes broadly as "exculpatory." He cites *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) for the proposition that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material

1. A pretrial motion to suppress this evidence was denied, but this ruling is not challenged.

2. A medical pathologist testified that Cook sustained two stab wounds, one of which had entered his chest wall and pierced his heart; the other of which had entered the right flank from the rear and partially severed a major blood vessel in the groin. The witness stated either wound, in itself, was sufficient to cause death.

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The proposition is undoubtedly correct, though we note that the record reveals no specific request for such evidence other than for materials relating to his polygraph examination. Nevertheless, we think that, even absent such a specific request, a prosecutor has the duty to make available to the defense evidence that is truly exculpatory, rather than merely favorable.[3] *Brady* suggests that such evidence would be "material either to guilt or to punishment." Exculpatory evidence has also been defined as "evidence which extrinsically tends to establish defendant's innocence of the crimes charged, as differentiated from that which although favorable, is merely collateral or impeaching." *People v. Bottom*, 76 Misc.2d 525, 351 N.Y.S.2d 328, 334–35 (1974). Cf. *People v. Fraiser*, 75 Misc.2d 756, 348 N.Y.S.2d 529 (1973). A piece of evidence in the possession of the prosecutor, therefore, cannot be considered exculpatory merely because the defendant chooses to call it so.

Gee argues that a detective testified both at the suppression hearing and later at trial that exculpatory statements existed which would support his claim of self-defense, but a careful reading of the record discloses only that he indicated there were statements, and that these statements were not exculpatory, but accusatory. The record does suggest the existence of statements indicating that at this scene of gang hostility other members of appellant's own gang were observed with drawn knives—one of which may even have had blood on it— and that someone had a cane. But in view of Gee's own repeated, uncontroverted, and independently corroborated admission that he had stabbed Glenn Cook, the finding of the pathologist that either wound sustained by

3. See ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, § 3.11(a) (Approved Draft, 1971).

Cook in itself would have been fatal, and the absence of any statement other than Gee's own placing a cane or any other weapon in the hands of the decedent, these statements would seem neither to have supported Gee's claim of self-defense nor to have suggested the provocation needed to reduce murder to manslaughter.

On the day of his arrest, Gee was given a polygraph examination, and he now argues that, apart from the question of the admissibility of the polygraph results themselves which will be discussed subsequently, the Commonwealth's failure to turn over to defense counsel "every test, every result, every interview sheet that was taken in connection with that polygraph test" was a violation of its duty to turn over exculpatory evidence. This evidence was exculpatory in the sense that it certainly contained exculpatory statements by appellant, but not in the sense that its denial precluded him from any additional evidence; it did not "extrinsically" tend to establish innocence or to mitigate guilt. The record of the suppression hearing makes it clear that the results of the examination were inconclusive, and that in the course of this examination appellant merely gave the same version of the stabbing he gave in his prior informal statement and his subsequent formal statement. Both of these statements were admitted into evidence, and any additional probative value of evidence that he remained firm and consistent in his version of events at an intermediate time would clearly be minimal in light of the consistency already shown and should not be allowed to outweigh the danger of improper inferences arising from references to the polygraph examination. Cf. *Commonwealth v. Johnson*, 441 Pa. 237, 272 A.2d 467 (1971).

As for pre-trial discovery in general, the law in Pennsylvania is clear that, absent "proof by the defendant, after hearing, of exceptional circumstances and compelling reasons" he may be permitted only "to inspect

and copy or photograph any written confessions and written statements" made by him, and that he is not entitled to "pretrial discovery or inspection of written statements of witnesses in the possession of the Commonwealth." Pa.R.Crim.P. 310. See also *Commonwealth ex rel. Specter v. Shiomos*, 457 Pa. 104, 320 A.2d 134 (1974); *Commonwealth v. Stafford*, 450 Pa. 252, 299 A.2d 590 (1973), cert. denied, 412 U.S. 943, 93 S.Ct. 2775, 37 L.Ed.2d 404 (1973); *Commonwealth v. Turra*, 442 Pa. 192, 275 A.2d 96 (1971). Here appellant made no pretrial showing of "exceptional circumstances and compelling reasons" that would entitle him to pretrial discovery beyond that of his own statements, nor was the notice-of-alibi rule, which would have entitled him to reciprocal discovery, enforced against him. Cf. *Commonwealth v. Jackson*, 457 Pa. 79, 319 A.2d 161 (1974). The Commonwealth did make available during presentation of its own case-in-chief all relevant statements in its possession and not merely those of witnesses it ultimately called to the stand, and the record does not support appellant's claim that he was denied effective access to the statements during the trial. Cf. *Commonwealth v. Kontos*, 442 Pa. 343, 276 A.2d 830 (1971).

■■ At the trial the Commonwealth called only one eyewitness to the killing, Steven Lambert, and indicated to the defense that it was not going to call a number of others who had given statements to the police because they had changed aspects of their stories and were not thought to be reliable witnesses. The changes, however, were not exculpatory in nature and appeared rather to strengthen the evidence of guilt. Appellant nevertheless now argues that in not calling these witnesses the Commonwealth failed in its obligation not to withhold testimony favorable to the accused, apparently on the theory that it thereby precluded him from cross-examining these witnesses about the inconsistencies with their prior statements. The law is clear, however, that the Com-

monwealth is not required to call to the stand all available witnesses, particularly if it regards them as unreliable, as long as it makes their names and whereabouts available to the defense. See *Commonwealth v. Jones*, 452 Pa. 569, 308 A.2d 598 (1973); *Commonwealth v. Carter*, 427 Pa. 53, 233 A.2d 284 (1967); *Commonwealth v. Horn*, 395 Pa. 585, 150 A.2d 872 (1959). The Commonwealth here made all such witnesses available to the defense, and indeed procured them for the defense to call at trial if it chose to do so. Hence, it was also not error, as appellant argues, for the court to refuse to charge the jury that it could draw an unfavorable inference from the Commonwealth's failure to call additional witnesses. Cf. *Commonwealth v. Carter*, supra.

Because of what it continued to regard as exculpatory evidence in these witnesses' prior statements, the defense determined to call them on its own behalf. Since it appeared that these witnesses might have been involved with one side or the other in the gang hostility that accompanied the killing, a hearing was held in the judge's chambers to advise each potential witness of his right to counsel and his right not to incriminate himself, and some of them eventually chose not to testify and were excused for this reason. Others indicated that they were willing to testify, but it became apparent that at least some of them were eager to testify not for Gee, but against him. Because of this, the judge repeatedly warned defense counsel that such witnesses might be harmful to his client, and that if he made them his witnesses and they testified adversely, he could not claim surprise and impeach them with their prior statements. Counsel indicated that he still expected them to testify in a manner consistent with their statements to the police, and that this would be helpful to his client. When these witnesses were called to the stand, they did not testify as counsel hoped, and all efforts at contradition or impeachment by means of the prior statements were objected to

by the Commonwealth and precluded by the court. Gee argues that this was error.

The origins of the rule that ordinarily a party cannot impeach the testimony of a witness he himself has called is shrouded in historical obscurity. It is generally thought to be a relic of the primitive time when parties were not supported by witnesses in the modern sense of the word, but by "oath-helpers" whose function was not to attest to facts but the purely partisan one of swearing for the party calling them. See 3A Wigmore, Evidence § 896 (Chadbourn rev. 1970). Since these oath-helpers were ordinarily chosen by the party from among his own relatives, friends, or adherents and countered by similar oath-helpers representing the other side, it was thought appropriate to regard each party as vouching for the credibility of his own witnesses and bound by what they affirmed. Courts have long recognized, however, that a strict application of the ancient voucher rule under the conditions of modern jurisprudence can lead to injustice, and so they have articulated and developed a number of exceptions to the rule, usually without questioning whether the rule itself remains a valid one.[4] One such well-established exception permits a party, who has been surprised by an adverse statement made by a witness he has called, to cross-examine him on the basis of his prior inconsistent statements. The general rule in this regard, however, is that

4. But see Rule 607 of the Federal Rules of Evidence, recently enacted into law, which totally abrogates the common law rule and provides that "The credibility of a witness may be attacked by any party, including the party calling him." The Notes of the Advisory Committee which promulgated the Rule justify it in this manner: "The traditional rule against impeaching one's own witness is abandoned as based on false premises. A party does not hold out his witnesses as worthy of belief, since he rarely has a free choice in selecting them. Denial of the right leaves the party at the mercy of the witness and the adversary." While this new rule and its rationale are not binding upon us, they are highly persuasive indications of the prevalent trend toward liberalization in this area.

prior inconsistent statements are hearsay and admissible not as substantive evidence of the truth of the prior statements, but merely to impeach the credibility of the present ones.[5]

The Commonwealth here contends that defense counsel was not entitled to cross-examine these witnesses on the basis of surprise because he had not talked to the witnesses before calling them, and because he was fully warned by the prosecutor that they were untrustworthy and by the judge that it appeared they might testify against his client. It cites language in *Commonwealth v. Turner*, 389 Pa. 239, 253, 133 A.2d 187 (1957), and *Selden v. Metropolitan Life Insurance Company*, 157 Pa.Super. 500, 505, 43 A.2d 571 (1945), for the proposition that to plead surprise a party must be genuinely surprised and not merely disappointed.[6] But *Turner* and *Selden* depend as much upon the lack of genuine adverseness in the testimony sought to be impeached as upon the lack of genuine surprise, and rather than deciding such cases solely on the basis of strict definitions of surprise, we think that the more flexible approach articulated in *Commonwealth v. Gomino*, 200 Pa.Super. 160, 173, 188 A.2d 784 (1963), and quoted with approval by this Court

**5.** This distinction has been firmly adhered to in Pennsylvania. See, e. g., *Commonwealth v. Tucker*, 452 Pa. 584, 307 A.2d 245 (1973). We note, however, that it has been strongly criticized as both unrealistic and an inappropriate application of the hearsay rule, since the person who made the statement is available for cross-examination about its truth or falsity. See 3A Wigmore, Evidence § 1018 (Chadbourn rev. 1970). Rule 801(d)(1) of the Federal Rules of Evidence specifically excludes such prior statements from the category of hearsay.

**6.** The Commonwealth further points out that the pertinent language about surprise from *Turner* was quoted with approval in our recent decision in *Commonwealth v. Thomas*, 459 Pa. 371, 329 A.2d 277, 281 (1974). We note, however, that the opinion of the Court in *Thomas* which drew on the *Turner* language, represented the views of only three justices. Moreover, the view of at least five justices that the greater part of the cross-examination permitted the prosecution in that case was improper was based not on the absence of surprise, but on the absence of adverseness.

in *Commonwealth v. Smith*, 424 Pa. 544, 548, 227 A.2d 653, 655 (1967), is a more appropriate standard to follow:

> " 'While as a general rule a party who calls a witness represents him as being worthy of belief and cannot impeach him, *this rule has been considerably relaxed to prevent injustice and the tendency of the courts is to permit parties to show the truth without strict regard to technicalities.' "* (Emphasis in original.)

Pennsylvania courts have frequently permitted parties to contradict or impeach witnesses called by them without a strict requirement of surprise when the interests of truth and justice seem to require it. See, e. g., *Commonwealth v. Smith,* supra; *Commonwealth v. Deitrick,* 221 Pa. 7, 70 A. 275 (1908); *Commonwealth v. Staino,* 204 Pa.Super. 319, 204 A.2d 664 (1964); *Commonwealth v. Gomino,* supra; *Commonwealth v. Gurreri,* 197 Pa.Super. 329, 178 A.2d 808 (1962); *Commonwealth v. Bartell,* 184 Pa. Super. 528, 136 A.2d 166 (1957); *Commonwealth v. Bowers,* 182 Pa.Super. 628, 127 A.2d 806 (1956).[7]

■■■■■■ In addition, the United States Supreme Court has held that in some circumstances the strict application of a state's voucher rule to prevent a defendant from cross-examining or contradicting a witness he himself has called can be a denial of his right to due process of law. *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). As Mr. Justice Powell has

---

7. In *Bowers* the victim of an alleged statutory rape had voluntarily signed a statement accusing the defendant, her stepfather, and then testified against him at the preliminary hearing. Later the prosecutor was informed by both a letter from defense counsel and the girl personally that she now denied the truth of her prior written statement. When she subsequently repudiated the statement on the stand, the prosecutor was permitted to plead surprise and cross-examine her about the inconsistency. The Superior Court held that the cross-examination was within the allowable discretion of the trial court, and that there was a legitimate basis for the plea of surprise because the prosecutor might reasonably have expected the girl to return to her original statement when sworn and placed on the witness stand.

trenchantly observed in *Chambers*: ". . . in modern criminal trials, defendants are rarely able to select their witnesses: they must take them where they find them." 410 U.S. at 296, 93 S.Ct. at 1046. Although—unlike the new Federal Rules of Evidence, which unequivocally allow the credibility of any witness to be attacked by any party—Pennsylvania law invests a measure of discretion in the trial judge as to whether a party may cross-examine a witness he himself has called, it would be an abuse of discretion for the judge to deny cross-examination strictly on the basis of lack of surprise if to do so would be to cause substantial injustice to the defendant. In this case, however, the trial judge has indicated in his opinion denying Gee's motion for a new trial that his refusal to allow cross-examination about the witnesses' prior statements was based not only on the absence of surprise but also on the collateralness of the prior inconsistencies to the issues of fact to be determined by the jury.

Since Gee in a statement prior to trial, the accuracy and voluntariness of which he did not contest at trial, admitted that he had stabbed Glenn Cook, the only significant disputed issue of fact for the jury to resolve was whether or not the decedent first attacked him with a cane, thus absolving him of or mitigating his guilt. He also declared in his statement that he had stabbed the decedent only once and then retreated, while the Commonwealth's witness, Steven Lambert, testified that, still swinging his knife, he followed in the direction of the retreating Glenn Cook. However, even if the jury were to accept Gee's version of subsequent events, the uncontroverted and undisputed opinion of the expert pathologist was that either wound alone would have been fatal; thus, Gee would have been responsible for Glenn Cook's death even if another had subsequently stabbed him. Therefore, although we are hampered by the absence in the record of the statements given by these witnesses to

the police and regarded by Gee as exculpatory, and by Gee's failure to specify clearly why he regarded them as such and what he would have been able to prove had the witnesses testified consistently with their prior statements, a careful reading of the record suggests that his reliance on their exculpatory nature was misplaced.

The record indicates that only one of these witnesses, Leroy Malachi, testified at trial about the stabbing itself. Another witness, Charles Waters, had apparently told the police prior to trial that he had seen several boys with knives and one with a cane, and he repeated this on the witness stand. On cross-examination by the Commonwealth, however, he stated that the boy with the cane was not the decedent but Michael Leatherbury, a member of the June Street Gang. Since the original statement apparently did not say that Glenn Cook had the cane, only that somebody did, there was no contradiction of the earlier statement, only an amplification of it. Defense counsel obviously hoped that testimony that a cane was present would lend support to Gee's story, but significantly he did not ask the witness who had the cane, and so obviously did not rely on any previous statement that it was in the possession of the decedent. When the Commonwealth brought out on cross-examination the damaging testimony that it was a member of Gee's own gang who was swinging the cane, thus not only casting doubt on Gee's version of events but suggesting to the jury where he might have gotten the idea for his story, defense counsel had not only no basis for surprise, but no prior contradiction to provide a basis for impeachment. Similarly, the witness, Leroy Malachi, had apparently stated to the police that Leatherbury had a knife, while on direct he stated that he had a cane; on cross, however, he resolved the apparent contradiction by testifying that Leatherbury had both a knife and a cane, and that he regularly carried the cane because of a crippled leg.

Gee, through cross-examination concerning a statement given to the police, attempted to show that another member of the June Street Gang, known as White Mouse, had been seen with a bloody knife. But one potential witness who had told this to the police declined to testify on Fifth Amendment grounds, as did White Mouse himself. Waters, who did take the stand, denied that he saw White Mouse with a knife in his hand; in his statement he apparently had said that White Mouse did have a knife, though there was no indication he said it had blood on it. In view of Gee's admission that he had stabbed the decedent, an inconsistency as to whether the witness had seen White Mouse with a knife, even one that might have had blood on it, particularly since he did testify he had seen others with knives, was clearly a matter collateral to the issue of whether or not decedent had attacked appellant with a cane. Cf. *Commonwealth v. Lynch*, 455 Pa. 213, 314 A.2d 274 (1974); *Commonwealth v. Fisher*, 447 Pa. 405, 290 A.2d 262 (1972). Even more clearly collateral and irrelevant were defense counsel's efforts to bring out apparent inconsistencies as to whether or not Glenn Cook was a member of the Moon Gang, particularly since another witness, Kevin Miller, did state that he was. Certainly even if it were established beyond all doubt that the decedent was a member of the rival gang, this, in itself, would lend no support to Gee's claim that Glenn Cook had attacked him with a cane.

We therefore conclude that in this case the trial judge did not abuse his discretion in preventing defense counsel from cross-examining the witnesses he himself had called. Although it might well be a denial of due process for a court to forbid a defendant from impeaching his own witness strictly on the basis of lack of surprise where the witness had made a prior exculpatory statement "under circumstances that provided considerable assurance of [its] reliability," as in *Chambers v. Mis-*

*sissippi,* supra, 410 U.S. at 300, 93 S.Ct. at 1048, due process does not require that a defense counsel, who calls witnesses on the basis of unreliable [8] prior statements that are not exculpatory and are merely collateral to the matter at issue, be permitted to impeach those witnesses by means of these statements. Nor, for the same reason, was it an abuse of discretion for the judge subsequently to refuse to allow defense counsel to impeach these witnesses indirectly through the police officers who took down their statements. We are of the opinion that such judicial discretion is important as a check on the delay and confusion which can be caused by collateral testimony, and that the burden must remain with a defendant, not strictly surprised by adverse testimony and seeking to cross-examine an adverse witness he himself has called, of showing that the denial of such cross-examination would be an injustice to him because the prior statement depended upon was exculpatory and sufficiently indicative of reliability to make reliance upon it reasonable. See and compare *Commonwealth v. Bowers,* supra.

 Gee further argues that it was error to exclude the results of his polygraph examination. This Court has repeatedly and consistently held that the results of a polygraph examination are inadmissible for any purpose in Pennsylvania because the scientific reliability of such tests has not been sufficiently established. See, e. g., *Commonwealth v. Brooks,* 454 Pa. 75, 309 A.2d 732 (1973); *Commonwealth v. Johnson,* supra; *De Vito v.*

---

**8.** We do not think that collateral statements, given to police officers by persons who were present during an outbreak of hostility by two rival gangs and who might themselves have been involved in such hostility or had reason to think the police suspected them of such involvement, have the indicia of reliability of the exculpatory statements in *Chambers,* which were given spontaneously to three different close acquaintances of the witness, were corroborated by independent evidence, and were ¬gainst the witness's penal interest. In addition, defense counsel in this case had been warned repeatedly that the witnesses themselves were unreliable and probably adverse, yet he apparently made no effort to talk to them before calling them to the stand.

*Civil Service Commission,* 404 Pa. 354, 172 A.2d 161 (1961). Gee points out, however, that a number of jurisdictions have now held such results to be admissible, and that the scientific accuracy of such tests has so improved in recent years that we should reconsider our position with regard to them. Certainly it is incumbent upon us to be alert to developments in this field so that, if indeed lie detectors have passed beyond the experimental stage to a trustworthiness comparable to that of other scientific tests whose results have immeasurably aided our courts in their search for truth, we do not deny ourselves the enlightenment they might provide. We also note that polygraph results have been admitted in other jurisdictions under conditions in which the court is satisfied of their probative value, and that such admissibility has found persuasive judicial advocates. See, e. g., *United States v. Ridling,* 350 F.Supp. 90 (E.D.Mich. 1972).[9] We do not think, however, that the present case is an appropriate one in which to reconsider our established view about the reliability of such tests, since the record indicates that the results of the test given to Gee were inconclusive.

Gee also argues that he was denied a fair trial because of the inconsistency of trial rulings and the conduct of the judge during the course of the trial. After a careful examination of the record, we find the argument to be without merit.

Judgment affirmed.

POMEROY and NIX, JJ., concur in the result.

9. We note also, however, that one jurisdiction, Oklahoma, which previously held it to be within the discretion of the trial judge whether or not to admit polygraph results when all parties stipulate to their admission, recently overruled the prior holdings and held such results inadmissible under any circumstances, because "of the potential unreliability of polygraph examinations at this time." *Fulton v. State,* 541 P.2d 871 (Okl.Crim.App., 1975).

ROBERTS, J., filed a dissenting opinion in which MANDERINO, J., joined.

JONES, C. J., did not participate in the consideration or decision of this case.

ROBERTS, Justice (dissenting).

I believe that this case provides a good example (1) why we should abandon the ancient doctrine that the party producing a witness vouches for his truthfulness and (2) why we should admit the prior inconsistent statements of witnesses as evidence concerning the matters contained in the statement.

In this case the police took statements from approximately half a dozen eyewitnesses to the killing. Apparently[1] several of these witnesses stated that decedent was a member of a gang, that the clash which resulted in his death was a gang fight, and that someone, possibly decedent, had a cane during the fight which preceded the killing. These statements tended to corroborate appellant's claim that decedent attacked him with a cane and that he killed to protect himself from serious bodily harm.[2]

Sometime after these statements were given, however, all but one of these witnesses changed their testimony. The Commonwealth called the one witness whose testimony did not change. He testified that he saw no cane and that neither he nor decedent were members of a gang. The Commonwealth refused to call the other witnesses because they were felt to be unreliable, having changed their stories.

1. None of these statements are in the record, therefore, we must rely on partisan descriptions to determine what they contain.

2. The majority asserts that these statements addressed only matters collateral to the central inquiry. I cannot believe that a claim of self-defense and evidence supporting such a claim are collateral to a murder prosecution.

In an effort to use the statements which tended to verify appellant's version, appellant's counsel called two of the witnesses who had changed their minds and asked them about the incident. When they testified in accordance with their changed stories, appellant's counsel plead surprise and asked that he be allowed to impeach on the basis of the prior inconsistent statements. The trial court did not allow him to do so. Although the trial court explaned to appellant and his counsel before the witnesses were called that it would not allow any claim of surprise, and though this ruling was probably sustainable, I believe that we should reverse the ruling which kept these relevent and freely given statements from the jury.

It is important to realize that the earlier statements given by the witnesses to the police shortly after the killing were probably as reliable or more reliable than the corresponding in-court testimony.

> "In many cases, the inconsistent statement is more likely to be true than the testimony of the witness at the trial because it was made nearer in time to the matter to which it relates and is less likely to be influenced by the controversy that gave rise to the litigation."

Comment, California Evidence Code § 1235.

Moreover, the witnesses who made the statements are available for cross-examination concerning the earlier statements and the conditions under which they were given.[3] The trier of fact may observe the witness as he

---

3. "It does not follow, however, that prior self-contradictions, when admitted are to be treated as having no *affirmative testimonial* value, and that any such credit is to be strictly denied them in the mind of the tribunal. The only ground for doing so would be the hearsay rule. But the theory of the hearsay rule is that an extrajudicial statement is rejected because it was made out of court by an absent person not subject to cross-examination . . . . Here, however, by hypothesis the witness is present and subject to cross-examination. There is ample opportunity to test him as to the basis for his former

explains or denies giving the earlier statement.[4] Nothing is lost to the normal procedure in which the jury evaluates the weight and credibility to be accorded the witness' testimony.[5] The practice of admitting a witness' prior inconsistent statement as substantive evidence has been accepted in many jurisdictions. See Fed.R. Evid. 607, 801(d)(1) (prior inconsistent statement admissible as substantive evidence upon request of any party); *Gelhaar v. State*, 41 Wis.2d 230, 163 N.W.2d 609 (1969), cert. denied 399 U.S. 929, 90 S.Ct. 2229, 26 L. Ed.2d 796 (1970) (prior inconsistent statement admissible as substantive evidence when in writing and declarant is available for cross examination); Cal.Evid.Code § 1235 (prior inconsistent statement admissible as substantive evidence when declarant available for cross-examination); Kansas Stat.Anno. § 60–460(a) (prior statement admissible as substantive evidence if declarant is a witness, without regard to consistency of statement); New Jersey R.Evid. 63(1) (prior inconsistent statement admissible as substantive evidence when used to impeach witness); Utah R.Evid. 63(1) (prior inconsistent statement admissible without regard to use for impeachment); Uniform R.Evid. 801(d)(1) (similar to Fed.R. Evid. 801(d)(1) that prior inconsistent statement is admissible as substantive evidence).

Allowing such statements to be admitted in evidence for the truth of the matters stated would require just two changes in the law of evidence as it presently exists

statement. The whole purpose of the hearsay rule has been already satisfied."
3A Wigmore, Evidence § 1018, at 996 (Chadbourn rev. 1970) (emphasis in original).

4. "If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court."
*Di Carlo v. United States*, 6 F.2d 364, 368 (2d Cir. 1925) (Learned Hand, J.).

5. See McCormick, Evidence § 251 (1972).

146

in Pennsylvania. First, any party should be allowed to impeach any witness. If this were not allowed, only the party who did not call the witness could use a prior inconsistent statement. This would be virtually the same as present law. Second, the prior inconsistent statement would be admissible not only to impeach the witness, but would be substantive evidence. These changes are not drastic, as evidenced by their acceptance in the jurisdictions listed above.[6]

The majority's result serves only to keep relevant and reliable evidence from the jury. Its result serves no greater principle than judicial inertia. I believe that a trial is, fundamentally, a search for an objective account of the events upon which the criminal charges are based. An evidentiary rule which forces the searcher to ignore relevant clues whose reliability can be tested by cross-examination serves no purpose. I, therefore, dissent from the majority's result.

MANDERINO, J., joins in this dissenting opinion.

6. This result would also appear to be required by *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).