401 A.2d 1209

**In the Interest of Victor Perry WRIGHT, a minor child.**

**Appeal of Victor Perry WRIGHT, a minor child, by Virginia Barrett and Edward Barrett, his mother and step-father.**

Superior Court of Pennsylvania.

Argued Oct. 23, 1978.

Decided April 12, 1979.

David B. Washington, Pittsburgh, for appellants.

Robert E. Colville, District Attorney, Pittsburgh, for Com., appellee.

Before CERCONE, WIEAND and HOFFMAN, JJ.

HOFFMAN, Judge:

 This is an appeal from an adjudication of delinquency of Victor Perry Wright, 17 years old, based on charges that he forcibly raped his stepmother's sister, Marlene Lynch, 22. Wright contends that he should have a new hearing because the court below (1) refused to allow evidence of the results of a polygraph test administered to Wright, (2) refused Wright's request to transfer his case to the adult criminal courts, and (3) refused to allow two witnesses to give their opinion on whether Ms. Lynch was intoxicated during the events in question. Although we find the first two contentions meritless,[1] we agree that it was reversible error to exclude the opinion evidence offered on the issue of the credibility of the rape prosecutrix. We will therefore reverse and remand for a new hearing.

Ms. Lynch testified that she arrived at a family picnic at the home of her sister, Carolyn Lynch Wright, between three and four o'clock in the afternoon. She admitted that she drank two, three, or possibly more, bottles of beer there. She met Wright at the picnic and talked with him. She denied embracing or kissing him at any time. Later in the afternoon, when Wright and Joseph Sipior (Wright's older brother-in-law) asked her to go with them to feed the watchdog at Sipior's place of employment, she agreed. She got in the front seat of Sipior's car between Wright and Sipior, and the three proceeded to their destination. Ms. Lynch said that she was merely enjoying social conversation

---

1. Our Supreme Court has held that the results of polygraph examinations are not admissible for *any* purpose in Pennsylvania. Thus, the contention that they ought to be admissible in juvenile court because of that system's special solicitude for the rehabilitation of the child is without merit. *Commonwealth v. Gee*, 467 Pa. 123, 141–42, 354 A.2d 875, 883–884 (1976).

 Wright requested his own transfer to the criminal courts under 11 P.S. § 50–325(c), but the court below denied the transfer relying on the standards in 11 P.S. § 50–325(a), which allows a court on its own motion to transfer a case to the criminal courts. However, we need not decide whether the standards of a (c) transfer are any different from the standards for an (a) transfer, because Wright has waived his rights in this regard by failing to make his motion until one day of testimony has already been received by the juvenile court.

with Wright and denied hugging and kissing him in the car. After tending to the dog, they drove to a tavern and purchased a six-pack of beer. She drank some of this six-pack, perhaps a can or two. Sipior then drove them to the home of a friend of his. After leaving the friend's house, they drove back to the tavern and purchased another six-pack. By this time, Ms. Lynch had stopped drinking. Then Sipior drove them to a place called the "Forty Acres." Ms. Lynch testified that she had been to the Forty Acres before and knew it to be a wooded area with riding trails, but she denied that she suggested that they go there.

She continued to testify that Sipior drove very recklessly through the Forty Acres, at one point driving off the road and hitting a tree. The parties then got out of the car, and at Sipior's direction, Wright walked away from the scene. Sipior then threw Ms. Lynch against the car and opened her vest, tearing off a button in the process. She swung wildly at Sipior and screamed for Wright. Sipior knocked her to the ground. His nose was bleeding from where she had struck him, and his blood was all over her. She got up and ran for assistance to Wright, who, after hearing her screams, had returned. She buttoned up her vest and got back into the car. Sipior started driving, but later the car stopped again. Sipior said he needed a wrench to fix the car. Ms. Lynch said she would go to one of the nearby houses and borrow one. She testified that she said this as a ruse to get away and that she walked off with the intention not to return. She then testified that Wright caught up to her, saying he would go with her, but that when they got out of Sipior's sight, Wright pulled her into the woods, knocked her down, pulled off her clothes, and had forcible sexual intercourse with her. Afterwards, when Wright had departed, Ms. Lynch put her clothes back on, and walked back to the car, joining Sipior and Wright. They all drove off but sometime later Sipior had yet another accident. At this point, Ms. Lynch fled from the car, and got a ride from a stranger to a police station. She testified that she simply ran through the station without telling anyone what hap-

pened and proceeded on foot to the home of her cousins, Ed and Lynn Lutz. A police car followed her there. She told the Lutzes that she had been raped. Later her sisters Carolyn Lynch Wright and Edie Lynch arrived and took her to the hospital.

The investigating officer of the Pittsburgh police, Robert Spehar, testified that a vaginal swab test revealed the presence of seminal fluid, and that Ms. Lynch's underclothes contained spermatazoa. Her outer clothing contained light soiling and botanical matter, and type AB blood, but was not torn except for a button missing from her vest. Officer Spehar also exhibited several photographs of her injuries sustained that day which revealed bruises on her feet, right knee, and right back thigh. However, Ms. Lynch identified every injury in the photographs as inflicted upon her by Joseph Sipior when he assaulted her. For that reason, the photographs were excluded from evidence.

Joseph Sipior testified that when he was at Carolyn Wright's picnic, he observed Ms. Lynch drinking beer. She asked him if she could accompany him and Wright to feed Sipior's watch dog. They left at approximately 6:00 p. m. After feeding the dog, Sipior stopped at a bar and purchased a six-pack of beer which he offered and shared with Ms. Lynch. Wright did not drink any beer while they were in the car. They stopped for a short time at the home of James Davis. During all this time, Sipior noticed that Ms. Lynch was continually drinking beer and sitting close to Wright. When they left Davis' house, they drove past a wooded area. Ms. Lynch said she wanted to go there because she remembered it as a favorite place from her childhood, where she used to go horseback riding. However, when Sipior went to reach for his third beer, the six-pack was empty. He then drove back to the tavern for another six-pack, and he and Ms. Lynch continued to drink from it. Sipior had never been to the "Forty Acres", but upon her urging, he returned there. They stopped to look at an old, bullet-ridden Plymouth off the side of the road. As Sipior was opening another beer, he saw Ms. Lynch attempt to

climb to the top of a little slag and gravel hill, but she kept falling down on the loose surface. When challenged to a "King of the Hill" game, Sipior also slipped and fell trying to climb to the top. The parties then returned to the car and continued driving. At one point Sipior hit a tree, but he was able to back up and keep driving.

Sipior further testified that his car then hit a mud puddle and the engine stopped. Suspecting that moisture from the puddle had gotten into the distributor, he attempted without success to use his knife to pry off the radiator cap. Sipior directed Wright to go to one of the nearby houses and borrow a screwdriver for him. Ms. Lynch insisted on going with him. When after 15 minutes or so they had not returned, Sipior walked after them. He first bumped into Wright who said that he had not gotten a screwdriver because Ms. Lynch had asked him into the woods. Ms. Lynch then joined them and they all got back into the car. However, Sipior admittedly was driving recklessly and hit another tree. Ms. Lynch then jumped out of the car and ran away. Sipior allowed Wright to drive back to the picnic, where they arrived at about 10:00 p. m.

Edward Barrett, Wright's stepfather, testified that he had travelled to the "Forty Acres" and observed, among other things, an old bullet-ridden Plymouth, a slag and gravel hill, and a depression in the ground (a mud puddle on a dry day) where Sipior had testified they were. The court admitted the photographs he had taken of those scenes.

The juvenile, Victor Perry Wright, testified that he arrived at the picnic around two or three o'clock in the afternoon, met Marlene Lynch there, and talked to her. Whenever he saw her, she had a drink in her hand, sometimes liquor and sometimes beer. When he went into the basement to get a soda out of the refrigerator, Ms. Lynch came over and put her arms around his waist, but when his brother Buddy Wright came in, she dropped her arms and staggered back outside. Later, Ms. Lynch called to him from a nearby bedroom, and they sat on the edge of the bed and kissed. The juvenile stopped when he realized that

Robin Wright, his sister-in-law, had seen them. Concerning the circumstances of his departure with Sipior and Ms. Lynch, and their travels which eventually led to the Forty Acres, the juvenile's testimony was substantially identical to Sipior's,[2] except that the juvenile stressed that all during the trip he was hugging and kissing in the car with Ms. Lynch.

Wright further testified that when the car became disabled, Sipior directed him to go to one of the nearby houses and procure a screwdriver. Ms. Lynch said that she wanted to come with him and then solicited sexual relations, to which Wright was agreeable. They travelled out of Sipior's sight and found a spot in the woods where they had consensual intercourse. Afterwards, he walked back and met Sipior, and then Ms. Lynch joined them. Back at the car, Sipior was now able to start the engine. Later he went to make a right turn and hit a tree. Believing that Sipior was too drunk to drive, Wright announced his intention to proceed on foot. Ms. Lynch came with him. After they had walked a bit, Sipior drove up to them, stopped the car, and asked Wright to drive the rest of the way home. He agreed, but Ms. Lynch said she would rather walk.

Carolyn Lynch Wright, the juvenile's step-mother and the victim's sister, testified that at approximately 10:20 p. m., Wright and Sipior returned to the picnic but left shortly thereafter. Then she got a phone call from Ed Lutz telling here that Ms. Lynch was with him and that she had been raped. Carolyn Wright went to the Lutz's home and talked with her sister who said she had been raped by Victor Perry Wright. Carolyn Wright observed that one of her sister's knuckles was smashed and bruised, her fingers swollen, her shins scraped and bruised, and that there was a large bruise on her neck.

James Davis testified that at about 7:00 p. m., Sipior, Wright and Ms. Lynch arrived outside his home and stayed

2. For instance, he specifically corroborated Sipior's testimony that Ms. Lynch was continuously drinking, that it was her suggestion to go to the Forty Acres, that she fell down a gravel hill, and that Sipior's car stopped because he drove too fast through a mud puddle.

about 35 to 40 minutes. Ms. Lynch introduced herself to him and they spoke for a while. Davis observed that Sipior and Ms. Lynch were drinking beer but Wright was not. While he and Sipior talked, he observed Wright and Ms. Lynch sitting in the car together, hugging and kissing.

Neil Wright, the juvenile's natural father, testified that he saw Marlene Lynch drink a few beers at the picnic. Buddy Wright, the juvenile's brother, testified that he saw Ms. Lynch at the picnic with a mixed drink. Later when he went down into the basement, he saw Ms. Lynch with her arms around his brother and that when she saw him, she let go and stumbled off. The juvenile told him that nothing was going on because Ms. Lynch was just drunk. He later saw the two of them in a bedroom, sitting together and kissing. Robin Wright, Buddy's wife, testified that she saw Ms. Lynch drinking at the picnic and saw her kissing Wright in a bedroom. She also saw Ms. Lynch stumble and spill a drink she was carrying at the picnic.

Counsel for the juvenile asked two witnesses, Joseph Sipior and James Davis, whether in their opinion Marlene Lynch was intoxicated. The court refused to let either witness answer because he was not qualified as an expert. Thereafter, counsel merely asked his witnesses to relate what they observed about Ms. Lynch's drinking and her appearance.[3]

**3.** The following exchange occurred when the court was questioning Robin Wright:

"Q. Did you think she [Marlene Lynch] was intoxicated?

"A. I guess she was, but I am no expert. I couldn't say.

"Q. Well, we don't want you to guess . . . .

"MR. WASHINGTON: Your Honor, please, before she answers that question, now, I have attempted—in fact, I backed off with this witness. I have attempted with my other witnesses, as the Court knows . . . repeatedly the Court has instructed me on attempting to qualify these people as experts . . . . Now, Your Honor, you directly are asking her the question that you wouldn't permit me to ask.

\* \* \* \* \* \*

"THE COURT: I will withdraw the question to the extent she has already stated she is no expert."

N.T. 10/21/77 pp. 38–39

■ We must first determine whether there was an adequate foundation upon which to admit the opinions of Davis and Sipior. Generally the only foundation which is required for the admission of lay opinion is a showing that the witness had personal knowledge and observation of the facts and circumstances upon which he bases his opinion. *Commonwealth v. Eyler*, 217 Pa. 512, 516–17, 66 A. 746 (1907); *Rouch v. Zehring*, 59 Pa. 74, 78 (1868); *Lewis v. Mellor*, 259 Pa.Super. 509, 517–518, 393 A.2d 941, 946 (1978). "A person who has actual knowledge from observation . . . is competent to testify as to whether an individual is intoxicated." *Gaynor v. Atlantic Greyhound Corp.*, 183 F.2d 482, 485 (3d Cir. 1950). Thus, when the witness observes the actions and conduct of the individuals said to be intoxicated, there is an adequate foundation for the opinion offered. *Turner v. Pa. Liquor Control Bd.*, 161 Pa.Super. 16, 18, 53 A.2d 849 (1947).

■■ Here, Davis testified that Marlene Lynch was in his presence for about 35 to 40 minutes. He engaged in conversation with her, shook her hand, and observed her drinking. We therefore conclude that there was an adequate, in fact excellent, foundation upon which to receive his opinion as to Ms. Lynch's sobriety. Because Sipior observed Ms. Lynch over an extended period of time, we also conclude that there was an adequate foundation for his opinion.

Given the adequate foundation, the Commonwealth admits that it was error to exclude lay opinion on the issue of a person's intoxication. *See Commonwealth v. Eyler, supra* ; *Commonwealth v. McLaughlin*, 202 Pa.Super. 520, 198 A.2d 419 (1964); *Commonwealth v. Chapman*, 186 Pa.Super. 632, 142 A.2d 469 (1958). However, it has been urged upon us for several reasons that the error was harmless.

While it is understandable why counsel might not want to continue to ask his witnesses for their opinions on the prosecutrix's intoxication, it is of course necessary to do so in order to force a ruling and preserve the issue for appeal. Because only Sipior and Davis were asked for their opinion, we may only discuss the court's ruling as to them. We do not base our decision on whether any of the other witnesses should have been allowed to give their opinions on this issue.

■ "[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a 'reasonable possibility' that an error 'might have contributed to the conviction,' the error is not harmless." *Commonwealth v. Story*, 476 Pa. 391, 409, 383 A.2d 155, 164 (1978) (citations omitted). While most questions of harmless error arise, as in *Story*, when the *Commonwealth's* evidence, hurtful to the accused, is improperly *admitted* at trial, we have been especially reluctant ever to conclude that relevant evidence, helpful to the accused, can be harmlessly *excluded*. *See Commonwealth v. Ilgenfritz*, 466 Pa. 345, 353 A.2d 387 (1976) (exclusion of defendant's evidence on cause of death is reversible error); *Commonwealth v. Graves*, 461 Pa. 118, 334 A.2d 661 (1975) (exclusion of defendant's evidence of his intoxication negating requisite criminal intent is reversible error); *Commonwealth v. Goodman*, 182 Pa.Super. 205, 126 A.2d 763 (1956) (refusal of court to allow defendant to impeach testimony of rape prosecutrix is reversible error). Bearing in mind that the burden of proof rests upon the Commonwealth to prove that the error was harmless beyond a reasonable doubt, *Commonwealth v. Story, supra* 476 Pa. at 406, 383 A.2d at 162 n. 11, we will now examine the record to see if the erroneous exclusion of opinion evidence regarding Ms. Lynch's state of intoxication was harmless.

The court below and the Commonwealth in its brief assert two reasons why the error was harmless: (1) since the court heard substantial evidence that Ms. Lynch was drinking during the day, any opinion evidence on her intoxication would have been merely cumulative, and (2) there was other evidence in the record apart from the intoxication issue, which revealed that Ms. Lynch was a more credible witness than Wright or Sipior.

■ The first reason advanced—that the court could assess Ms. Lynch's credibility from the ample evidence of her drinking during the day—is wrong for two reasons. First, the fact that a person drinks does not impeach his credibility; evidence of drinking is admissible only because it lays a

foundation for an opinion of the *intoxication* of the witness. Intoxication, which numbs the faculties and thus affects the witness' ability to observe and recollect, is the evidence necessary to impeach a witness' credibility. *Commonwealth v. Godfrey*, 177 Pa.Super. 640, 644, 112 A.2d 434, 436 (1955); 3A Wigmore, Evidence, § 933 (Chadbourn rev. 1970). Thus the court below could not have properly relied merely on the evidence of Ms. Lynch's drinking in order to assess her ability to observe and recollect during the events in question—he needed evidence on her intoxication, evidence which he erroneously excluded. The second reason why the excluded opinion evidence offered was not cumulative is that Sipior was present with Ms. Lynch and observed her immediately prior and subsequent to the alleged rape; thus Sipior was the *only* witness (other than Wright) who could testify as to her state of sobriety at that exact time concerning which her credibility as a witness was challenged. Davis' observations of Ms. Lynch would be the next most proximate in time to the events in question. Even if the testimony of those who saw Ms. Lynch drinking at the picnic was relevant, it would have much less probative value than the excluded opinion evidence, since her drinking at the picnic was anywhere from four to six hours removed from the crucial events in question.

The Commonwealth also contends that the error was harmless because the court below specifically relied on other evidence, outside of the intoxication issue, upon which it was able to conclude that Ms. Lynch was a more credible witness than Sipior or Wright. The court below in its opinion states that Ms. Lynch's testimony of forcible rape was corroborated by her outcry and escape at her first opportunity, the condition of her clothing and physical state, and "inconsistencies and conflicting testimony" of Wright and Sipior in support of their contention that Ms. Lynch initiated and consented to the sexual act with Wright. However, our review of the record does not support this conclusion.

The promptness of Ms. Lynch's outcry is very much in doubt since her own testimony is that while a stranger drove

her to a police station, she just ran through it without reporting the rape to anyone. Moreover, the record allows no other conclusion than that Ms. Lynch had several opportunities to escape prior to the time she actually parted company with Wright and Sipior. She had good reason and opportunity to escape after Sipior's indecent assault, but returned to the car without any claim that she was being coerced or held against her will. Ms. Lynch herself testified that when Sipior's car broke down, she volunteered to get a screwdriver from a nearby house as a pretext to leave her companions. However, after Wright caught up with her, raped her and left her alone in the woods, she simply gathered up her clothes, returned to her companions, and voluntarily got back in Sipior's car. It boggles the mind to understand why, if prior to the rape Ms. Lynch had decided to leave, then *after* the rape she decided to return to her two assailants, when she was alone and could have walked to one of the nearby houses.

Regarding her physical condition and appearance, Ms. Lynch herself testified that all of her injuries revealed in the police photographs were inflicted upon her by the assault of Joseph Sipior. Her smashed and bruised knuckle is consistent with her swing which bloodied Sipior's nose. Again, we know from her own testimony that she was covered with the blood from Sipior's nose. The dirt and botanical matter on her clothing are equally consistent with consensual intercourse in the woods as they are with rape. The only extent to which her clothes were damaged—the button torn off her vest—we again know from her testimony was the result of Sipior's assault on her. In short, *none* of this evidence corroborates her testimony of forcible rape.

Lastly, our review of the record, set forth here in ponderous detail, does not reveal any important inconsistencies between the testimony of Sipior and Wright. In fact, their testimony is substantially identical. Moreover, their testimony was corroborated by other witnesses. The juvenile's testimony of hugging and kissing with Marlene—denied by her—was corroborated by several witnesses. Important de-

tails of Sipior's testimony—the gravel hill, the bullet-ridden car, the mud puddle—were corroborated by another witness and photographic evidence.

■■■■■ In sum, the record indicates that this is a very close case. Any decision basically comes down to a finding on the credibility of the witnesses.[4] Evidence of the intoxication of the rape prosecutrix is crucially important, and therefore we cannot say that such error was harmless.[5]

The adjudication of delinquency is reversed and the case is remanded for a new hearing.

CERCONE, President Judge, joins this opinion and files a concurring statement.

WIEAND, J., files a concurring and dissenting opinion.

CERCONE, President Judge, concurring:

This is a very weak case of rape involving a 22-year old female and a 17-year old minor. There is practically no evidence that would establish the minor's guilt beyond a reasonable doubt. Although the sufficiency of the evidence is not at issue, nevertheless, the nature of the evidence makes it imperative that all the evidence pertaining to the surrounding circumstances of the case be admitted including evidence of the victim's intoxication so that the fact-finder can have this additional evidence in making his determination of the guilt or innocence of the minor.

4. This opinion does *not* attempt to determine the credibility of the witnesses, as stated in the dissenting opinion. We have discussed the fact that the trial judge's stated reasons for believing Ms. Lynch and disbelieving Wright and Sipior are disproved by the record only because that argues against the asserted harmlessness of the error. The credibility of these witnesses is to be determined by the trier of fact, *after* he has heard all the relevant evidence on the issue.

5. It is irrelevant that the finder of fact in this case was a judge and not a lay jury. *See Commonwealth v. River*, 218 Pa.Super. 184, 187, 279 A.2d 766, 767 (1971). Where relevant and probative evidence crucial to the decision on an issue is excluded from trial, a judge as fact-finder is kept equally in the dark as a lay jury.

WIEAND, Judge, concurring and dissenting:

Victor Perry Wright, seventeen years of age, was adjudicated delinquent following a hearing in which it was found that he had assaulted and raped his stepmother's sister. The majority reverses the adjudication and remands for another hearing because the hearing judge excluded lay opinion testimony that the victim had been intoxicated. Although I concur in the majority's determination that the lower court's evidentiary ruling was in error, I believe the error was harmless beyond a reasonable doubt.

The juvenile and Marlene Lynch met at a family picnic held on August 7, 1977 at 3625 Churchview Avenue, Pittsburgh, the home of the juvenile's father and stepmother. After several hours, the juvenile and Marlene left the picnic with Joseph Sipior to feed a watchdog at Sipior's place of employment. Thereafter they twice stopped at bars to purchase six-packs of beer, visited the home of Sipior's friend, James Davis, and drove to a wooded area on East Agnew Extension, Baldwin Boro, Allegheny County. There, in darkness, they experienced difficulty with Sipior's vehicle, which stalled after colliding with a tree and after having been driven through an accumulation of surface water. After the juvenile had walked away from the car, Sipior grabbed Marlene, pushed her against the car, and tore a button from the vest she was wearing. Marlene struck Sipior in the face and screamed for the juvenile, who thereupon returned to the car. The young men managed to start the car, only to have Sipior declare a need for a screwdriver because the car was not functioning properly. Marlene volunteered to go in search of one and left, to be followed by the juvenile. When they were a short distance from the vehicle, the juvenile knocked Marlene to the ground, held her down and pulled off her clothes. He then engaged in sexual intercourse with her. Thereafter, they returned separately to Sipior's car and left the wooded area. When an accident occurred, Marlene jumped out of the car and began running and screaming. An unidentified motorist picked her up and took her to the police station. There she said

that she had been raped and asked to use the lavatory. Instead of remaining there, however, she ran to her cousin's home where she attempted to clean herself of blood and dirt. She was thereafter taken to a hospital.

The juvenile admitted an act of sexual intercourse but testified that it had been consensual. He was corroborated by Joseph Sipior. The hearing judge rejected this explanation. He did so because of inconsistencies which he found in the young men's testimony and also because he found that the condition of Marlene's clothing and the injuries apparent to her person corroborated her version of the manner in which intercourse had occurred.

Appellant attempted to attack the victim's credibility by showing that she had been intoxicated. Intoxication is a matter where the line between a witness's opinion and his affirmation of fact is indistinct. Word descriptions are sometimes inadequate to convey the full import of visible manifestations. Thus, it is proper for a witness who has observed another's conduct and physical condition to supplement his or her description by an opinion. Because intoxication is a matter of common knowledge and observation, opinions of non-expert witnesses are admissible. *Commonwealth v. Eyler*, 217 Pa. 512, 66 A. 746 (1907); *Commonwealth v. McLaughlin*, 202 Pa.Super. 520, 198 A.2d 419 (1964); *Commonwealth v. Chapman*, 186 Pa.Super. 632, 142 A.2d 469 (1958). Before a witness can testify to an opinion, however, he or she must first lay a foundation therefor by articulating the facts which support such an opinion. This requires more than opportunity for observation. It requires, rather, that the witness identify those facts upon which his or her opinion of another's intoxication is founded. Unless the witness can identify and articulate facts forming a reasonable basis for such an opinion, the witness's opinion should not be received. *Laubach v. Colley*, 283 Pa. 366, 129 A. 88 (1925); *Commonwealth v. Eyler*, supra; *Turner v. Pennsylvania Liquor Control Board*, 161 Pa.Super. 16, 53 A.2d 849 (1947); *Commonwealth v. Rouchie*, 135 Pa.Super. 594, 7 A.2d 102 (1939). See also: *Gensemer v. Williams*, 419 F.2d 1361 (3rd Cir. 1970).

The record in the instant case is filled with references to the fact that Marlene had been drinking alcoholic beverages. James Davis, who had been visited by Sipior, Marlene, and the juvenile, observed that Marlene had been sipping beer intermittently from a plastic glass. Although he had had ample opportunity to observe Marlene, he was able to identify neither physical condition nor conduct on her part that would support an opinion that she had been intoxicated. The observed fact that she had been sipping beer was inadequate, without more, to permit the expression of an opinion that she was intoxicated. The hearing judge's exclusion of Davis' opinion, therefore, was correct. It was only his reason for the ruling, i. e., that the witness was not an expert, that was erroneous.

Robin Wright, the juvenile's sister-in-law, who had been present at the picnic, said that Marlene had been "staggering a bit" and had spilled a drink. When asked if she thought Marlene had been intoxicated, she replied: "I guess she was, but I am no expert." Neil Wright, Jr., the juvenile's brother, saw Marlene stagger during the afternoon and heard his brother say, "She's drunk." He was not asked to give his own opinion. Victor Perry Wright, the juvenile, testified that Marlene had been drinking beer and liquor. He was not asked and did not express an opinion about her state of sobriety.

The only witness who was improperly denied the right to express an opinion was Joseph Sipior. However, his testimony left no doubt that he thought Marlene had been intoxicated. Thus, he told the hearing judge that Marlene had been drinking beer and "didn't walk a straight line." He also described her speech as "crazy—like when you start getting high." Consequently, it is difficult to perceive how an expression of opinion concerning Marlene's lack of sobriety would have added to or strengthened the testimony of this witness.

In summary, one witness testified the victim had been staggering, another said she was intoxicated, a third quoted the juvenile as saying "she's drunk," and a fourth witness

opined that she couldn't walk a straight line and talked as though she were getting "high." I cannot agree with the majority that this evidence was insufficient to enable the factfinder to make an accurate assessment of Ms. Lynch's state of sobriety for purposes of determining the credibility of her testimony.

The trier of the facts, it must be remembered, was an experienced juvenile court judge and not a jury of lay persons. Indeed, it is unlikely that even lay persons could have failed to grasp the import of the juvenile's evidence. The victim's consumption of alcohol and the manifestations of intoxication apparent in her conduct were certainly sufficient to alert the judge, who understood exactly what appellant was trying to prove, that the victim's ability to perceive and remember accurately may have been impaired. Moreover, the hearing judge's remarks at the time of entering his adjudication make it clear that he did give due consideration to this aspect of the case and made an assessment of the victim's state of sobriety.

Nevertheless, he decided the credibility issue in favor of the victim. In doing so, he found that the evidence of Marlene's intoxication had been outweighed by other, more significant indicia of truthfulness. Her prompt outcry at the police station and again at the home of her cousin, her charge of rape repeated to the juvenile's step-mother, who was also her sister, and the condition of the victim's clothing and physical appearance were found by the hearing judge to be controlling. The hearing judge also found inconsistencies in the facts narrated by Sipior and the juvenile. The majority has recited various reasons for disregarding the hearing judge's finding and determines the credibility issue adversely to the victim and favorably to appellant. It was the hearing judge, however, who heard and saw the witnesses and who was in a better position to make such a determination. His findings have the same effect as the verdict of a jury. *Commonwealth v. Truss*, 230 Pa.Super. 262, 326 A.2d 630 (1974). It is enough for our purpose of review that the lower court's determination of the victim's credibility

was unaffected by the erroneous evidentiary ruling. As such, the error was harmless. See: *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978).

The hearing in the instant case, if not perfect, was thorough and fair. The juvenile was not in any way deprived of the fundamentals of a fair hearing. The issues in dispute received the careful and impartial consideration of the jurist who heard the case. A remand for rehearing, therefore, is unnecessary. See: *Commonwealth v. Martinolich*, 456 Pa. 136, 162, 318 A.2d 680, 694–695 (1974).

Appellant also complains that the Juvenile Court judge refused to receive and consider the results of a polygraph test. I concur with the majority's rejection of this contention. The law is clear that the results of polygraph tests are not admissible in a court of law. The scientific reliability of such tests has never been established. *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976); *Commonwealth v. Brooks*, 454 Pa. 75, 309 A.2d 732 (1973); *Commonwealth v. Saunders*, 386 Pa. 149, 125 A.2d 442 (1956); *Commonwealth ex rel. Riccio v. Dilworth*, 179 Pa.Super. 64, 115 A.2d 865 (1955). There is no good reason for creating an exception, as appellant would have us do, to permit the results of polygraph tests to be used in juvenile hearings.

Appellant contends finally that the Juvenile Court abused its discretion when it denied appellant's request to transfer the case to criminal court for trial by jury.[1] Appellant's motion for transfer, however, was not timely made. It was made for the first time at the start of the second day of hearings. By that time, the evidence in support of the delinquency petition had been introduced, and a part of the juvenile's case had also been presented. By failing to make his request before the court began hearing the petition on its merits, appellant waived his right to request a transfer. Certainly it was too late to request a transfer after the evidence in support of the petition had been fully presented.

1. Act of December 6, 1972, P.L. 1464, No. 333, § 28(c), 11 P.S. § 50–325.

I would affirm the adjudication of delinquency; and therefore, I respectfully dissent.