## Szmodis v. Geiger

*Stephen L. Shields,* for plaintiffs.
*Thomas A. Wallitsch,* for defendant.

GARDNER, *J.,* October 22, 1985—

### FINDINGS OF FACT

1. The science of thermography was developed a few years ago in an effort to test for the existence of soft tissue injuries.

2. Soft tissue is a description given to the contents of the area between the bone and the skin including muscles, tendons, ligaments and nerves.

3. Traditional scientific testing methods are incapable of measuring soft tissue damage. These traditional methods include the CAT scan, myelogram, EMG, and routine x-rays.

4. Thermography is in its incipient stage of development. Research continues to be done in this area. Although there are several adherents to this discipline, the field has not yet gained general acceptance in the medical community.

5. The theory upon which thermography is based is as follows: Thermography basically measures the emission of heat in an area of the body. As a rule, when a nerve is irritated, the function of that nerve

is disturbed. Subsequently, that nerve, which goes into the muscle or soft tissue, will not have proper circulation. The absence of proper circulation results in insufficient blood in the area. Because one of the functions of blood is to carry heat, cold spots or hot spots develop. Thermography attempts photographically to capture these cold spots and hot spots.

6. For approximately three years thermography has been utilized as an accepted technique at Johns Hopkins University Medical School and for a slightly longer period at the University of Southern California Medical Center.

7. Doctor M. Mathew Hooshmand, plaintiffs' witness, is apparently the only physician in the Allentown, Pennsylvania area utilizing this technique, although other nonphysicians may be utilizing the technique locally at this time.


## DISCUSSION

Based on the foregoing Findings of Fact and on the discussion which will follow, the objection of defendant to the proposed testimony of plaintiffs' witness Dr. Hooshmand concerning results of a thermography test is sustained.

The case of Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), established a test to be applied when a new scientific development is being considered for admissibility into evidence. The Frye court enumerated the following test:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced

from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

In that case the Court of Appeals ruled that what they called a "deception test" or a "systolic blood pressure test" (which we today call a "polygraph" or "lie detector test") was inadmissible. Pennsylvania established its own rule in this area by adopting the Frye rule. Initially it was adopted in a case called Com. v. Topa, 471 Pa. 223, 231, 369 A.2d 1277, 1281-1282 (1977).

Topa determined that admissibility of such evidence would depend upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs. The Topa case held a voice print inadmissible despite the fact that the witness who would testify about voice prints had experience in more than 180,000 voice print cases. That witness sincerely felt, as we believe Dr. Hooshmand sincerely feels, that the particular technology was valid and appropriate.

In ruling the way we are ruling, we are not in any way being critical of Dr. Hooshmand or this particular field of scientific experimentation and endeavor. We can all be thankful that science and medicine continue to seek new ways to expand our knowledge and continue to experiment with and develop techniques that will assist us in detecting and curing disease and pain. And we commend the scientific and medical communities, and we commend Dr. Hooshmand, for their effort to develop this new procedure.

However, the law is a little bit more conservative than medical science. And while it is appropriate,

and indeed probably necessary for the survival of mankind, for medicine to develop new techniques, the law is a little slower and more cautious and conservative in its adoption of new principles, and the law requires something more than a respectable minority of the medical community in order for a new principle to be accepted as a principle of evidence in court.

The law requires general acceptance in the scientific community, and on the face of this record we do not have established such general acceptance. Language from the case of Com. v. Gee, 467 Pa. 123, 142, 354 A.2d 875, 884 (1976), a Pennsylvania Supreme Court case, is instructive. That case was dealing with the polygraph, but the language is equally applicable to our situation:

"Certainly it is incumbent upon us to be alert to developments in this field so that, if indeed lie detectors have passed beyond the experimental stage to a trustworthiness comparable to that of other scientific tests whose results have immeasurably aided our courts for the search for truth, we do not deny ourselves the enlightenment they might provide."

We do not believe that the thermograph has passed beyond the experimental stage to a trustworthiness comparable to that of other scientific tests which our courts have embraced on the face of this record at this stage.

One rationale why the courts are more cautious than the scientific community in accepting new principles was explained in the case of Com. v. Nazarovitch, 496 Pa. 97, 102, 436 A.2d 170, 173 (1981), a Pennsylvania Supreme Court case: One rationale for this standard is "fear that the trier of fact will accord uncritical and absolute reliability to

a scientific device without consideration of its flaws in ascertaining veracity."

We believe that this situation is distinguishable from the malpractice concept. A doctor is not guilty of malpractice where he chooses to ascribe to a minority viewpoint if that viewpoint is one of a significant minority. Donaldson v. Maffucci, 397 Pa. 548, 156 A.2d 835 (1959); Tobash v. Jones, 419 Pa. 205, 213 A.2d 588 (1965). When determining whether a doctor is guilty of malpractice, an accepted minority view is appropriate to follow and is a defense to a malpractice action.

On the other hand, where determining whether evidence of a scientific nature will be admissible into evidence our appellate courts have required something more than a minority view, even a respectable minority view. They have required general acceptance in the scientific community.

For all the foregoing reasons we sustain defendant's objection to the rendering of an expert opinion in the field of thermography by plaintiffs' expert witness Dr. M. Mathew Hooshmand.

## ORDER

And now, this October 22, 1985, upon consideration of the objection of defendant to the proposed testimony of plaintiffs' expert witness, Dr. M. Mathew Hooshmand, after an in-camera hearing held this date, and for the reasons expressed in the within Findings of Fact and Discussion.

It is ordered that defendant's objection to the expert testimony of Dr. M. Mathew Hooshmand in the field of thermography is sustained.