653 A.2d 1271

**In the INTEREST OF M.M.**

**Appeal of M.M.**

Superior Court of Pennsylvania.

Argued Sept. 30, 1994.

Filed Feb. 2, 1995.

308

David Zuckerman, Asst. Public Defender, Philadelphia, for appellant.

Joan Weiner, Asst. Dist. Atty., Philadelphia, for Com., participating party.

Before ROWLEY, President Judge, and CAVANAUGH, WIEAND, McEWEN, CIRILLO, OLSZEWSKI, BECK, KELLY and POPOVICH, JJ.

CIRILLO, Judge:

Appellant M.M.,[1] a juvenile, appeals from an order of the Court of Common Pleas of Philadelphia County adjudicating him delinquent and placing him on intensive drug and alcohol probation, pending further review before the juvenile court in sixty days. We affirm.

On September 6, 1992, at approximately 1:20 a.m., off-duty police officer Juan Perez was a passenger in a friend's car travelling in the vicinity of Whitaker and Wyoming Avenues in Philadelphia. As the officer and his friend stopped at a traffic light at the intersection, Officer Perez observed a "dark Hispanic" male standing on the southeast corner looking around in all directions as if he were a lookout. Alerted by this behavior, Officer Perez, who was in plain clothes, decided to investigate, and directed the driver to circle the block. When Officer Perez returned to the same corner, he noticed

---

1. Although the notice of appeal lists appellant's name as "W.M." the record otherwise refers to appellant as "M.M." For purposes of this appeal, appellant will be referred to as "M.M."

that the same "Hispanic" male had joined M.M. and another white male in the alleyway beside Roskow's Bar and Tavern on the southeast corner. At that time, Officer Perez observed M.M. standing on top of a steel gate, using a pair of large bolt cutters to break the lock on the gate leading to the basement of the tavern. Officer Perez then circled the block for a third time in an attempt to locate a marked police unit so as to advise them of the situation. Upon returning to the corner for a third time, the males realized that they were being watched and went to the rear of the alley, where they attempted to gain entrance to the the rear door of the tavern.

At that point, Officer Perez spotted a marked radio patrol car pulling up to the intersection. As Officer Perez got out of his car and advised the uniformed officers of the situation, the three males, including M.M., observed the police officers' presence and began to run. Officer Perez immediately chased after these three males, identified himself as a police officer, and ordered the three suspected burglars to stop. They ignored him and, instead, entered a blue 1978 Chevrolet Impala which was parked nearby with a driver waiting in the driver's seat.

Officer Perez reached the car before it sped away and attempted to prevent the car from driving off. With his gun in his right hand, he reached into the open driver's side window with his left arm and attempted to turn off the ignition. Although Officer Perez had identified himself to the driver as a police officer, the driver put the car in gear and sped off with Officer Perez still holding on to the car door. As Officer Perez was holding on to the door, the driver crashed the car into two parked cars in an attempt to remove the officer from the vehicle. Fearing for his life, Officer Perez released his grip and fell to the ground.

The uniformed officers, who had been following the chase in their marked patrol car, continued the pursuit and followed the blue Chevrolet eastbound on Wyoming Street. They were joined by Officer Broadbent and his partner in their patrol car. Officer Broadbent witnessed the blue Chevrolet stop at

H and Wyoming Streets, where four males exited the vehicle. Three of the males ran into a wooded area and the fourth ran along the street. Officer Broadbent chased this fourth male, apprehended him, and returned him to the scene where he was identified by Officer Perez.

In the meantime, Officer Perez had returned to the tavern, where he recovered the bolt cutters used by M.M. and discovered that the lock on the steel gate leading to the tavern's basement actually had been cut. Within five minutes, a police wagon returned to the tavern with M.M. Officer Perez immediately identified M.M. as the burglar he had just witnessed trying to break into the tavern with the pair of bolt cutters.

Following these events, M.M. was charged with attempted burglary, criminal conspiracy, aggravated assault, simple assault, possession of an instrument of crime, recklessly endangering another person, and resisting arrest. An adjudicatory hearing was held on November 18–20, 1992, before the Honorable Sheldon C. Jelin. Following a finding that M.M. had committed the acts of attempted burglary, criminal conspiracy, and possession of an instrument of crime, Judge Jelin adjudicated M.M. delinquent. By order dated November 20, 1992, Judge Jelin placed M.M. on intensive drug and alcohol probation and scheduled a review for two months later. M.M. filed a notice of appeal from the adjudication and placement on probation.

On appeal, M.M. claims that Judge Jelin erred in refusing to permit M.M. to ask Officer Perez on cross-examination certain questions in order to support the defense of misidentification. Specifically, Judge Jelin refused to permit M.M. to ask Perez whether he had anything to drink that evening or if he had been to any bars.

Before addressing the merits of M.M.'s appeal, we find it necessary to distinguish the order in this case from that involved in a previous decision of this court, namely, *In the Interest of K.B.*, 432 Pa.Super. 586, 639 A.2d 798 (1994). As a general rule, this court only has jurisdiction over appeals from final orders, unless we are otherwise empowered by statute or

rule of court. *Grove North America v. Arrow Lift,* 421 Pa.Super. 12, 17, 617 A.2d 369, 371 (1992); *see* Pa.R.A.P. 341. In order to determine what constitutes a final and appealable order, we must look beyond the technical effect of the order to its practical ramifications. *Grove North America,* 421 Pa.Super. at 17, 617 A.2d at 372. The order presently before this court is a final order and it is, therefore, appealable.

In this case, Judge Jelin adjudged M.M. delinquent and placed him on an intensive drug and alcohol probation, pending a review in sixty days. What makes this order a "final" order is the fact that Judge Jelin placed M.M. on probation. This is to be distinguished from this court's decision in *K.B.* In *K.B.,* this court addressed an order deceptively similar to the order presently before this court. There, we held that such an order was interlocutory and not appealable. *K.B.* involved a juvenile who was adjudicated delinquent by the Court of Common Pleas of Philadelphia County. The judge placed K.B. on *temporary* intensive drug and alcohol probation, pending a review in sixty days. K.B. appealed and claimed that the judge erred in denying his motion to suppress. This court quashed the appeal as interlocutory. We held that:

> [the] issuance of intensive drug and alcohol probation with a further hearing in 60 days is not a final, appealable order. It does not terminate the litigation and put K.B. out of court; on the contrary, it simply delays the final disposition so that [the judge] can more properly determine whether K.B. has returned to school, stopped his illicit gambling activities, and refrained from taking drugs.

*Id.,* 432 Pa.Super. at 589–90, 639 A.2d at 800.

Although the order presently before this court and the order in *K.B.* appear to be similar, they are critically different, albeit in an inconspicuous manner. The order in *K.B.* is unlike the present order in that it placed K.B. on *temporary* intensive drug and alcohol probation. It was this use of the word "temporary" in *K.B.* which led this court to determine that the order was interlocutory and unappealable. The judge's use of the word "temporary" in *K.B.* made his subse-

quent use of the word "probation" superfluous, as a person cannot be placed on "temporary probation." Such an order would be a contradiction in terms. We interpreted the judge's temporary order in *K.B.* to be an evaluative disposition to determine if K.B. was amenable to treatment under the juvenile act of this Commonwealth, 42 Pa.C.S.A. §§ 6301, et seq. (1976) (amended 1978) (hereinafter "Juvenile Act"). The present order, however, does not contain the qualifying word "temporary" and so Judge Jelin's order of probation is a final order. Although this distinction may seem obscure, it is a critical one. It makes the difference between a temporary evaluation in *K.B.*, and the final order of probation in the present case.

Moreover, this court can only base its decision on what information and language is contained in the record, for we have no crystal ball to determine what was in the mind of the trial judge when he made his order. We can only rely on what is presented in the record.[2]

2. A review of the language used by the judge in each case as he presented the respective orders supports this court's decision. It happens that Judge Jelin fashioned the order in both *K.B.* and this case. In *K.B.* he stated:

> You'll be back in court at that time (60 days later). And I'm telling you, young man, if there's any further involvement with the juvenile system, you don't have anything good on your background, school absences, gambling, and everything else. So if you want to stay out on the street, my suggestion is you get an education.

*K.B.*, 432 Pa.Super. at 590 n. 7, 639 A.2d at 800 n. 7. In this case, however, Judge Jelin used the following language to address M.M.:

> Now, there's a recommendation and *I'm going to* follow that, and that is that we *place you on intensive drug and alcohol probation....* Now, *probation means* that you cannot get involved in any more trouble. Is that clear?
> ... Because *if you do get in any more trouble, that will be a direct violation of the terms of probation;* and *if you violate my probation,* then you are subjecting yourself to being sent to a juvenile facility where they can address your problem more seriously than you can on probation.... Now, I suggest also that you completely cooperate with the probation officer. If you don't, you're going to find there's a rift between you and the probation officer, and they're going to give me a negative report.... All right, *I will place you on intensive drug and alcohol probation.*

Adjudicatory Hearing at 12–13 (emphasis added). The different language used by Judge Jelin shows that K.B. was subject to rehabilitation

■ We find M.M.'s issue on appeal—that the juvenile court's limitation of M.M.'s cross-examination was an abuse of discretion—is without merit. M.M. claims that the trial court erred in refusing to permit M.M. to ask Officer Perez on cross-examination whether he had anything to drink that evening or whether he had been to any bars. The defense in this case was that Officer Perez was mistaken when he identified M.M. as one of the perpetrators. In addition to the presentation of alibi and character witnesses, the defense sought to prove that the identification was unreliable. Consequently, during the cross-examination of Officer Perez, the defense attempted to impeach his credibility by showing that his perception of M.M., and the events surrounding his arrest, may have been impaired by the consumption of alcohol.

■ "It is well established that the scope and limits of cross-examination are within the discretion of the trial judge and [the trial judge's exercise of judgment in setting those limits] will not be reversed in the absence of a clear abuse of that discretion, or an error of law." *Commonwealth v. Birch,* 532 Pa. 563, 566, 616 A.2d 977, 978 (1992) (quoting *Commonwealth v. Greene,* 469 Pa. 399, 404, 366 A.2d 234, 236 (1976)). It is also true that courts must permit "great latitude" as to the scope of cross-examination. *Commonwealth v. Thorpe,* 270 Pa.Super. 221, 228, 411 A.2d 497, 501 (1979). In this case, the judge properly determined that there was no foundation for asking the questions at issue.

M.M. relies on *Commonwealth v. Dreibelbis,* 217 Pa.Super. 257, 269 A.2d 387 (1970). In *Dreibelbis,* this court found that it was error to preclude the defense from questioning a witness (a co-conspirator testifying for the prosecution) as to whether he was using drugs on the day he made his observations. The court held:

[The] question was unobjectionable because it was asked for the purpose of attacking the credibility of the witness by showing that at the time of the event to which he testified

and evaluation and was not placed on probation. M.M., on the other hand, was clearly placed on probation. There were no conditions of probation in *K.B.,* whereas here we have conditions of probation.

his powers of observation and memory were impaired, so that his recollection and account of the experience might be inaccurate.

*Id.* at 260–261, 269 A.2d at 389 (quoting *Commonwealth v. Morrison,* 157 Pa.Super. 366, 368–69, 43 A.2d 400, 401 (1945)). It is crucial to point out that the court in *Dreibelbis* allowed the questioning as to the witness' drug usage because there were facts in that case which suggested, and practically guaranteed, that such questioning had a foundation and was based on more than mere speculation. The court itself recognized this as it stated, "[a] review of the facts in this case however reveals that questioning as to drug usage by the witness would have been more than just a general, shotgun attack at his credibility." *Id.* at 260, 269 A.2d at 389. The court went on to emphasize the importance of the underlying facts which provided a basis, or foundation, for this questioning, when it noted, "[a]ll of these facts tend to show that at the time of the event to which he testified his powers of observation and memory were impaired and his recollection and account of the experience perhaps inadequate...." *Id.*

The "foundational facts" present in *Dreibelbis* are numerous. The witness in *Dreibelbis,* a burglary accomplice, admitted to the District Attorney that he was under the influence of illegal drugs during the event in question. *Id.* Additional evidence provided that: the witness/accomplice admitted that the day after the crime he gave a statement to the police that Dreibelbis was not involved; twenty-one days after the crime, during an appearance in Juvenile Court, the witness maintained that Dreibelbis was not involved in the crime; and, the witness made no mention of Dreibelbis' participation in the crime until six months after the crime. *Id.* It is these facts which justified the questions on cross-examination as to the witness' drug use at the time of the crime. Since the accomplice admittedly was under the influence of drugs at the time in question, and because his account varied so often after the event, it was important to ascertain whether his powers of observation and memory were so impaired by his drug use that his account of the crime was not trustworthy.

The facts in the present case differ greatly from those in *Dreibelbis.* Here, Officer Perez never even suggested, much less conceded as did Dreibelbis' accomplice, that he was intoxicated at the time he witnessed the crime. Moreover, Officer Perez' account of the burglary did not vary as did the account of Dreibelbis' accomplice. Also, unlike this case, the intoxicant used by the witness in *Dreibelbis* was a controlled substance, not alcohol. This is an important distinction to be made since courts have treated usage of controlled substances as a per se reason to suspect cognitive impairment. *Commonwealth v. Johnson,* 291 Pa.Super. 566, 436 A.2d 645 (1981). Courts have consistently refused to make the same assumption about alcohol, and have held that only evidence of intoxication, and not mere consumption, is relevant as to whether alcohol affected a witness' perception. *See Commonwealth v. McGuire,* 302 Pa.Super. 226, 448 A.2d 609 (1982) (holding that "it is not merely the consumption of alcohol that is relevant to attack the credibility of a witness"); *In re Wright,* 265 Pa.Super. 278, 401 A.2d 1209 (1979) (deciding that "the fact that a person drinks does not impeach his credibility; evidence of drinking is admissible only because it lays a foundation for an opinion of the *intoxication* of the witness") (emphasis in original); *Commonwealth v. Godfrey,* 177 Pa.Super. 640, 112 A.2d 434 (1955) (holding that "[w]hether one may have partaken of some liquor is not the test of one's credibility and is the type of question, whether answered in the affirmative or negative, that may create in the minds of some jurors a most unfavorable inference").

 Impeachment evidence is evidence which is presented as a means of attacking the witness' credibility. Leonard Packel & Anne Poulin, *Pennsylvania Evidence* § 608 (1987). There are several principal ways to attack a witness' credibility: "evidence offered to attack the character of a witness for truthfulness, evidence offered to attack the witness' credibility by proving bias, interest, or corruption, *evidence offered to prove defects in the witness' perception or recollection,* and evidence offered to contradict the witness' testimony." *Id.* (emphasis added). It is possible to impeach a witness with

evidence that he or she was intoxicated or used drugs at the time of the observed event because it reflects on the witness' ability to perceive and remember accurately. *Id.* at § 608.5. It is very important, however, that, "[i]n order for the consumption of alcohol to be admissible as evidence to impeach, there must be *evidence* of intoxication. The mere consumption of alcoholic beverages is not probative of a lack of credibility and may create an unfair impression." *Id.* (emphasis added); *see also McGuire, supra,* 302 Pa.Super. 226, 448 A.2d 609; *Wright, supra,* 265 Pa.Super. 278, 401 A.2d 1209; *Godfrey, supra,* 177 Pa.Super. 640, 112 A.2d 434. In this case, therefore, in order for M.M.'s questions regarding the consumption of alcohol to be admissible as evidence to impeach, there must first be evidence of intoxication. The reason behind the exclusion of mere alcohol consumption, which is insufficient to prove intoxication, is that such evidence will be unfairly prejudicial. *McGuire, supra,* 302 Pa.Super. 226, 448 A.2d 609; *Wright, supra,* 265 Pa.Super. 278, 401 A.2d 1209; *Godfrey, supra,* 177 Pa.Super. 640, 112 A.2d 434; *Pennsylvania Evidence,* § 415. This rationale was clearly set forth in the Pennsylvania Supreme Court's decision in *Morreale v. Prince,* 436 Pa. 51, 258 A.2d 508 (1969):

> In terms of possible prejudice there is no functional difference between evidence that a litigant was drinking and evidence that he was in a bar. Both pieces of evidence give rise to the insidious inference that the individual involved was intoxicated or under the influence of alcohol, which inference, without some proof of intoxication, has no role to play in any case.

*Id.* at 53, 258 A.2d at 508–09. Although this rule is usually applicable to drivers in negligence actions, the rule is also applicable to other situations. *Pennsylvania Evidence,* § 415.

It is clear in this case that not only was there no evidence of intoxication, but there was no evidence that Officer Perez had consumed any alcohol whatsoever. The record does not even remotely suggest that Officer Perez was drinking or was intoxicated, or that his perception or powers of observation were impaired as a result of intoxication as M.M. suggests. If there were facts in this case, as in *Dreibelbis,* which provided a basis for the theory that Officer Perez might have been intoxicated, and therefore had impaired perception, then ques-

tions as to whether he had been to a bar or had been drinking may have been appropriate.[3]

We cannot allow cross-examination to become a fishing expedition, where the examiner may ask questions based on a subjective hunch, or worse, based on nothing at all, as is the case here. We are mindful of our Supreme Court's position regarding limits placed on cross-examination:

> The underlying reason for confining the scope of cross-examination is to promote order and method in the presentation of a case. Each party must have an opportunity to present his side of the case without the introduction of matters unrelated to his case *and not touched upon in his evidence.*

*Conley v. Mervis,* 324 Pa. 577, 581, 188 A. 350, 352–53 (1936), cited with approval in *Havasy v. Resnick,* 415 Pa.Super. 480, 491, 609 A.2d 1326, 1331 (1992) (emphasis added). There must be some basis, some foundation, in order for the proposed question in a case such as this to be appropriate. A proper foundation may be established with facts or testimony which suggest that the question is the result of more than mere speculation or guesswork.

In reaching this conclusion, we are cognizant that this is a juvenile, not an adult, proceeding. The fundamental purpose of the juvenile system is not to punish or penalize our wayward children, but to rehabilitate and protect them from their criminal tendencies. To this end, the Juvenile Act established a non-combative system, where our troubled youths would receive the individualized treatment and attention from the court that they require and, at the same time, would not be burdened with the stigma of a criminal conviction. *K.B., supra,* 432 Pa.Super. 586, 639 A.2d 798.

---

**3.** There is some question as to whether Officer Perez may have misidentified one of the other four males. Officer Perez testified that he had observed a dark Hispanic male and three white males, although the record indicates that at the scene he identified a *black* male as one of the participants. There is no evidence, facts or otherwise, suggesting that this possible misidentification was the result of Officer Perez' alleged intoxication. In addition, there was no similar confusion surrounding Officer Perez' identification of M.M.

Presently, M.M. has not been convicted of a crime; he has been adjudged delinquent. He has been placed on intensive drug and alcohol probation. We must be very mindful that by adjudicating M.M. delinquent, we have the opportunity to help this young man. To decide the present issue otherwise, therefore, does this young man a double disservice; he learns an unfortunate lesson in how to "beat the system," and he does not receive the help he so desperately needs.

Order affirmed.

ROWLEY, President Judge, concurs in the result.

KELLY, J., files an Opinion in Support of Reversal, in which WIEAND, McEWEN, and BECK, JJ., join.

BECK, J., files a Dissenting Statement.

KELLY, Judge, in support of reversal:

In this appeal, we are called upon to determine whether the juvenile court abused its discretion when it sustained an objection to the cross-examination of a fact witness with regard to his consumption of alcohol on the evening of an incident about which he is testifying and whether the exclusion of that line of cross-examination resulted in serious prejudice to the appellant such that the order which adjudicated the appellant delinquent must be vacated and a new hearing must be held. We reverse and remand for a new hearing.

The relevant facts and procedural background are as follows. On September 6, 1992, at approximately 1:20 a.m., off-duty police officer Juan Perez was a passenger in an automobile driving north on Whitaker Avenue in Philadelphia, Pennsylvania. Perez testified that he observed three males, one dark Hispanic and two white males, (N.T. November 18, 1992 at 12, 19, 22, and 31), attempting to break into a tavern by using bolt cutters on a gate lock. Perez stated that he observed these individuals three times as he circled the block in his friend's automobile. (*Id.* at 13, 19–23). The males noticed that they were being watched and went to the rear of the alley where they began tampering with the side door and

the locks, trying to gain entrance. Perez located a patrol car and informed the on-duty officers of what he had seen. When the police officers approached the tavern to investigate, the three individuals fled to a blue '78 Chevy Impala operated by a third white male. (*Id.* at 15, 24). Perez, who was pursuing them on foot, followed the three individuals to the Impala, reached into the driver's side of the automobile and attempted to turn off the ignition, but to no avail. The automobile began to pull away and Perez was forced to relinquish his hold to prevent severe bodily injury.

The on-duty officers pursued the vehicle in their patrol car. They were joined in the pursuit by Officer Broadbent and his partner in their police wagon. Officer Broadbent testified that he saw the blue Chevy stop at "H" and Wyoming Streets and four males exit the vehicle. (*Id.* at 37). Officer Broadbent stated that three of the males ran into the woods and the fourth ran along the street. Officer Broadbent chased this fourth male, apprehended him, and returned with him to the scene where the male was identified by Perez. (*Id.* at 38–40, 41). The suspect was a *black* male and the time was approximately 1:20 a.m. (*Id.* at 41–42). At approximately 1:40 a.m., the appellant was apprehended [1] by Officer Campbell, who had received a radio call about the incident. (*Id.* at 45–51). The appellant was then transported to the scene where Perez also identified him. (*Id.* at 45). As a result, the appellant was charged with the crimes of attempted burglary, criminal conspiracy, aggravated assault, simple assault, possession of an instrument of crime, recklessly endangering another person, and resisting arrest.

An adjudicatory hearing was held on November 18–20, 1992 before Judge Sheldon Jelin. At the hearing, Perez testified that several officers arrived at the scene at the same time with both the appellant and the black male suspect in custody and that Perez then identified the suspects simultaneously.

[BY MS. SAPPER:]

1. The appellant was apprehended two city blocks south of where the getaway vehicle had been abandoned. (N.T. November 18, 1992 at 45–51).

Q. And did the police bring my client back first or did they bring a second person back first?

[OFFICER PEREZ:]

A. Several officers came—

MS. FOLEY: Objection.

THE COURT: Overruled.

BY MS. SAPPER:

Q. Go ahead.

A. Several officers came to the scene and brought this defendant and another defendant, which they were I.D.'d at the scene and then transported to the east detectives.

Q. But did the officers all come at the same time with the two people or did they come individually?

A. *I believe they both came at the same time. They had two males in custody.*

(N.T. November 18, 1992 at 35) (emphasis added). In contrast, Officer Broadbent testified that he brought the black male suspect to the scene at approximately 1:20 a.m. At trial, the following exchange took place:

[BY MS. SAPPER:]

Q. And did you have any other prisoners or did you just bring that prisoner back?

[OFFICER BROADBENT:]

A. Just the one black male.

Q. And was there any other prisoner on the scene at the time that you arrived?

A. No.

Q. Did another prisoner—was another prisoner brought to that scene while you were there?

A. Not when I was there.

Q. How long were you at the scene?

A. A couple minutes.

(*Id.* at 41–42). Officer Campbell, who arrested the appellant and brought him to be identified at the scene at approximately

1:40 a.m., testified similarly that no other prisoner was present at the time he arrived and none arrived while he was there:

BY MS. SAPPER:

Q. Okay, officer, when you stopped my client, he was walking; isn't that correct?

[OFFICER CAMPBELL:]

A. Yes.

Q. And when you stopped him for investigation, that was around 1:40 a.m.; isn't that correct?

A. It was approximately in that time zone.

A. And after you stopped him, you then took him back to Whitaker and Wyoming; is that correct?

A. That's correct.

Q. And at that point were there any other prisoners at Whitaker and Wyoming that you recall?

A. *I didn't see any other prisoners.* There were other police vehicles and wagons there.

(*Id.* at 46–47) (emphasis added).

Moreover, Perez testified that he observed three males, one dark Hispanic and two white males, attempting to break into the tavern. (*Id.* at 12–14). Upon realizing that they had been noticed, the three males fled in a car driven by a third white male. (*Id.* at 15). Subsequently, Officer Broadbent observed a blue '78 Chevy Impala, which matched the description he had received over police radio, stopped at "H" and Wyoming Streets. He saw four males exit the car and run. (*Id.* at 37–38). Officer Broadbent captured a *black* male while the three others escaped. (*Id.* at 40). The black male was returned to the scene and identified by Perez. (*Id.* at 41). Nothing further in the record sheds light on whether this was a misidentification or whether Perez was in a position to observe the incident accurately and in a state of mind to correctly identify those at the scene of the crime. Perez testified only that he had observed a dark Hispanic male and three white males (*id.* at 12 and 19), although the record indicates that at the scene he identified a *black* male as one of the participants. (*Id.* at 40).

Additionally, that evening Perez was the passenger in an automobile owned and driven by a "friend." The name of the friend was not provided to the appellant prior to trial. When defense counsel questioned Perez about the identity of this potential witness, an objection was raised and, inexplicably, sustained.[2]

BY MS. SAPPER:

Q. And the person who was driving in the car, who was that person?

A. It's not the defendant to your left.

Q. No, no. I'm sorry.

The person whose car you were in, who was driving?

MS. FOLEY: Objection.

THE COURT: OVERRULED.

THE WITNESS: A friend of mines [sic].

BY MS. SAPPER:

Q. What was the name of your friend?

MS. FOLEY: Objection.

THE COURT: I'll sustain the objection.

MS. SAPPER: Your Honor, it is possible discovery. It was not provided in the 49.

THE COURT: I'll sustain the objection.

**2.** If the Commonwealth was aware of the existence of this potential witness, and if the witness' name and address were available to the Commonwealth, this information should have been provided to defense counsel as part of pretrial discovery under Pa.R.Crim.P. 305. Potentially, the witness might have been able to testify regarding the speed at which his or her automobile was traveling at the time when Perez made his initial observations, the identity of the perpetrators, the driving conditions that night, where they had been prior to the incident, Perez' possible alcohol consumption, whether he appeared inebriated and then possibly rendered an opinion regarding Perez' intoxication. Although the appellant has not raised an allegation of trial court error on this basis, we are forced to speculate why the unexplained objection was sustained and why this additional witness was permitted to remain anonymous and unavailable. This witness' testimony might have shed some light on Perez' ability to observe and recall on the night in question. When the order adjudicating the appellant delinquent is vacated and the case remanded for a new hearing, the name and address of the witness should be provided to the appellant as part of discovery in preparation for the new hearing.

BY MS. SAPPER:

Q. Had you been out with the friend prior to this?

A. Yes.

Q. Had you been to any bars?

MS. FOLEY: Objection.

THE COURT: SUSTAINED.

*Id.* at 33.

Thus, the Commonwealth's case against the appellant rested solely upon the testimony of this single eyewitness' observations. The appellant, however, presented three neighbors as alibi witnesses who attested to their knowledge of the appellant's whereabouts at the time of the incident. Dolores Clark, who lived across the street from the appellant's mother, testified that she saw the appellant ascending his mother's front steps at 12:20 a.m. At 1:01 a.m., she heard sirens, went downstairs and saw the appellant standing on his mother's front steps. Miss Clark proceeded to "H" and Wyoming Streets where she observed Michael Capilato and four or five other people, including the appellant, at a beer party in a friend's garage. Miss Clark stated that she last saw the appellant standing in front of Capilato's house between 1:30 and 1:40 a.m.

Michael Capilato, a twenty year old college student and neighbor of the appellant, testified that he saw appellant on "H" and Wyoming Streets from 1:15 a.m. until 1:40 a.m., and observed the appellant walking home in front of him. Capilato also stated that he saw Dolores Clark during the same time period. It was stipulated in the record that Miss Garber, a thirty-one year old neighbor, saw the appellant walking to the corner of "H" and Wyoming Streets after she heard sirens, although she was not sure of the time.

The appellant also presented two character witnesses. First, Kathleen Smith, a corrections officer, who had known the appellant and his family for more than ten years. It was stipulated that she would have stated, had she testified, that the appellant has a reputation for being peaceful, honest, truthful and generally of good character. (N.T. November 20,

1992 at 4). Second, Joan Striplin, the appellant's grandmother, with whom the appellant resided, testified that the appellant is well liked and has a good reputation in the community.

Following a finding of guilty to the charges of attempted burglary, criminal conspiracy and possession of an instrument of crime, the appellant was adjudicated delinquent:

THE COURT: All right. Thank you.

All right. I have heard the testimony and I have heard argument of counsel. I find this defendant guilty of attempted burglary, a felony of the first degree—

MS. SAPPER: Your Honor, it's a second-degree felony.

THE COURT:—I'm sorry, second degree, criminal conspiracy and possessing an instrument of crime.

I find this defendant not guilty of aggravated assault, not guilty of simple assault, not guilty of recklessly endangering another person and not guilty of resisting arrest.

I find the defendant delinquent.

(N.T. November 20, 1992 at 10–11). Disposition took place immediately thereafter as follows:

[THE COURT:] With regard to disposition, how old are you, young man?

THE DEFENDANT: Sixteen.

THE COURT: Do you go to school?

THE DEFENDANT? Yes, sir.

THE COURT: What school?

THE DEFENDANT: Delaware Valley High School.

THE COURT: Do we have a—where is Mr. Kiner?

MS. SAPPER: Your Honor, it's a private school.

THE COURT: How long have you been going to Delaware Valley High School?

THE DEFENDANT: For about four, five months now.

THE COURT: Where did you go before that?

THE DEFENDANT: Frankford High School.

THE COURT: Any prior contact, Miss Foley?

MS. FOLEY: No, Your Honor.

(PAUSE.)

THE COURT: Miss Sapper, I see that your client does have an alcohol problem; is that right?

MS. SAPPER: Well, Your Honor—

THE COURT: I see he has been at the Bridge a few years ago.

MS. SAPPER: Yes. I don't believe he currently has one, but I know he was treated in the past.

THE COURT: All right. Anything before I dispose of the case, Miss Foley?

MS. FOLEY: No, Your Honor.

THE COURT: All right, young man, I have reviewed your juvenile file, and there are certain problems which have to be addressed and we're going to address them.

Now, there's a recommendation and I'm going to follow that, and that is that we place you on intensive drug and alcohol probation. They are going to give you counseling to address whatever problem that you have.

Now, probation means that you cannot get involved in any more trouble. Is that clear?

THE DEFENDANT: Yes, sir.

THE COURT: Because if you do get involved in any more trouble, that will be a direct violation of the terms of probation; and if you violate my probation, then you are subjecting yourself to being sent to a juvenile facility where they can address your problem more seriously than you can on probation.

Is that clear to you?

THE DEFENDANT: Yes, sir.

THE COURT: Now, I suggest also that you completely cooperate with the probation officer. If you don't, you're going to find there's a rift between you and the probation officer, and they're going to give me a negative report. One thing you do not want is a negative report, because if I get one, I will take you off the street.

Is that clear?

THE DEFENDANT: Yes, sir.

THE COURT: All right. I will place you on intensive drug and alcohol probation.

I will give it a two-month review in "J" court.

Now, any other further contact with the juvenile court will be a violation of your probation as well. Is that clear?

THE DEFENDANT: Yes, sir.

THE COURT: All right, continue—we'll give it a two-month review, please.

THE COURT LIAISON OFFICER: 1/26/93, "J" court.

THE COURT: All right. You'll be back in court on January the 26th in "J" court, at which time we'll check your progress on probation.

(N.T. November 20, 1992 at 11–14). Thus, Judge Jelin sentenced the appellant to intensive drug and alcohol probation. This probation was conditioned upon the appellant staying out of trouble and cooperating completely with his probation officer, compliance with which Judge Jelin planned to assess in sixty days. The appellant filed timely notice of appeal on December 21, 1992.

The sole issue that the appellant raises for our review is: DID THE TRIAL COURT ERR IN DENYING APPELLANT, A JUVENILE, THE RIGHT TO CROSS–EXAMINE THE EYEWITNESS AS TO WHETHER HE HAD BEEN DRINKING PRIOR TO MAKING HIS OBSERVATIONS WHERE THE COMMONWEALTH'S CASE RESTED ENTIRELY ON THE RELIABILITY OF THE IDENTIFICATION?

Appellant's Brief at 3.

Preliminarily, we note that although the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, does not provide for the right of appeal, a recent panel of this Court, sitting *en banc*, has stated:

We note, initially, that both juveniles and adults alike have a right to appeal from a court of record. [The] Pennsylvania Constitution, Article V, Section 9 reads:

"There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law.

*Because juvenile court is a court of record, the right of appeal attaches.*

*In the Interest of A.P.*, 421 Pa.Super. 141, 145–46, 617 A.2d 764, 765–66 (1992), *affirmed*, 536 Pa. 450, 639 A.2d 1181 (1994). *See also Commonwealth v. Clay*, 376 Pa.Super. 425, 546 A.2d 101 (1988) ("The final Order of a Juvenile Court is the Dispositional Order as to a Delinquent Child, pursuant to 42 Pa.C.S.A. § 6352."). *Accord In the Interest of C.G.*, 428 Pa.Super. 314, 630 A.2d 1266 (1993). *See generally In the Interest of A.P.*, *supra*, 421 Pa.Super. 141, 617 A.2d 764 (A.P. adjudicated delinquent and placed on probation, appeal from the denial of motion for *nunc pro tunc* appeal properly before us); *In the Matter of Smith*, 393 Pa.Super. 39, 573 A.2d 1077 (1990) (Smith adjudicated delinquent, committed to Glen Mills School, direct appeal properly before us); *Commonwealth v. Clay*, *supra*, 376 Pa.Super. 425, 546 A.2d 101 (appellant adjudicated delinquent, committed to Sex Offender Program at Cornwell Heights Youth Development Center, appeal properly before us); *In the Interest of Steven J.*, 341 Pa.Super. 17, 491 A.2d 125 (1985) (appeal from adjudication of delinquency and disposition order, committing minor to youth detention center for eighteen months, reviewable in six months, was properly before us); *In the Interest of McDonough*, 287 Pa.Super. 326, 430 A.2d 308 (1981) (appeal from adjudication of delinquency prior to disposition hearing quashed as moot, but appeal from disposition of adjudicated delinquent is properly before us); *Commonwealth v. Russman*, 250 Pa.Super. 74, 378 A.2d 459 (1977) (appeal from adjudication of delinquency and disposition order, placing minor on probation with condition that he was not to drive a car, was properly before us).

In the instant case, Judge Jelin's proposed "sixty day review" hearing is merely a condition of the appellant's proba-

tion, separate from and having no bearing on the finality of the appellant's adjudication of delinquency. Notwithstanding a particularly positive outcome of that hearing wherein Judge Jelin would discontinue the appellant's probation altogether, the adjudication of delinquency would not be simultaneously eradicated. Thus, the appeal in the instant case from an order adjudicating the appellant delinquent and placing him on intensive drug and alcohol probation, is a final, appealable order and properly before us. Hence, we specifically overrule *In the Interest of K.B.*, 432 Pa.Super. 586, 639 A.2d 798 (1994) in which a panel of this Court stated that an order adjudicating a juvenile as delinquent and placing him on intensive drug and alcohol probation pending further review in sixty days was a nonappealable, interlocutory order.

In his only issue on appeal, the appellant asserts that the trial court erred when it denied to him the right to cross-examine the Commonwealth's sole eyewitness regarding the eyewitness' possible consumption of alcohol during the evening prior to making his observations. The appellant argues that the witness was mistaken when he identified the appellant as one of the males whom he had seen attempting to break into the tavern. The appellant contends that the reliability of the identification is contingent on whether the witness' ability to observe was impaired by the consumption of alcohol.

The scope and manner of cross-examination is within the sound discretion of the trial judge whose decision will not be overturned absent an abuse of discretion. *Commonwealth v. Birch*, 532 Pa. 563, 566, 616 A.2d 977, 978 (1992); *Commonwealth v. Wood*, 432 Pa.Super. 183, 210, 637 A.2d 1335, 1348 (1994). Cross-examination is limited to matters brought out on direct examination and matters dealing with credibility of the witness. *Commonwealth v. Salerno*, 179 Pa.Super. 13, 20, 116 A.2d 87, 91 (1955). On cross-examination, a witness may be impeached to show his bias, dishonesty, or defects in his ability to observe, remember or recount the matter about which he has testified. *Commonwealth v. Gwaltney*, 497 Pa. 505, 515, 442 A.2d 236, 241 (1982); *Commonwealth v. Hamm*, 474 Pa. 487, 500, 378 A.2d 1219, 1226 (1977).

As our Supreme Court stated in *Commonwealth v. Drew*, 500 Pa. 585, 459 A.2d 318 (1983):

> Any deficiency of the senses, such as deafness, or color blindness or defect of other senses which would substantially lessen the ability to perceive the facts which the witness purports to have observed, should of course be provable to attack the credibility of the witness, either upon cross-examination or by producing other witnesses to prove the defect. . . .
>
> [Abnormality] . . . is a standard ground of impeachment. One form of abnormality exists when one is under the influence of drugs or drink. If the witness was under the influence at the time of the happenings which he reports in his testimony or is so at the time he testifies, this condition is provable, on cross [examination] or by extrinsic evidence, to impeach. McCormick, *Evidence*, § 45 (2d edition, 1972).

*Id.* at 590–91, 459 A.2d at 321.

> "[Q]uestions pertaining to the use of drugs and alcohol are proper when asked 'for the purpose of attacking the credibility of the witness by showing *that at the time of the event to which he testified* his powers of observation and memory were impaired, so that his recollection and account of the experience might be inaccurate.'" *Commonwealth v. Duffy*, 238 Pa.Super. 161, 173, 353 A.2d 50, 57 (1975), *allocatur denied* (quoting *Commonwealth v. Dreibelbis*, 217 Pa.Super. 257, 261, 269 A.2d 387, 389 (1970)).

*Commonwealth v. Perdue*, 387 Pa.Super. 473, 486, 564 A.2d 489, 495 (1989), *allocatur denied,* 524 Pa. 627, 574 A.2d 68 (1990). *See Commonwealth v. Yost*, 478 Pa. 327, 386 A.2d 956 (1978); *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974). *See also Commonwealth v. Morrison*, 157 Pa.Super. 366, 368, 43 A.2d 400, 401 (1945) (trial court erred by refusing to allow defendant to ask witness on cross-examination whether he had been smoking dope cigarettes or drinking hard cider on the night in question where the purpose of the question was to attack the credibility of the witness by showing that, at the time of the event to which he testified, his powers of observation and memory were impaired, so that his recollec-

tion and account of the incident might be inaccurate; however, error held to be harmless when witness subsequently admitted to drinking later in the trial). *But see Commonwealth v. Godfrey,* 177 Pa.Super. 640, 112 A.2d 434 (1955) (trial court properly sustained Commonwealth's objection to defendant's attempted question on cross-examination concerning whether witness had consumed alcoholic beverages on the evening in question).

On cross-examination, however, questions concerning a witness' use of drugs or alcohol at times unrelated to the time frame of the witness' testimony are impermissible. *Commonwealth v. Yost, supra,* 478 Pa. at 337, 386 A.2d at 961; *Commonwealth v. Perdue, supra,* 387 Pa.Super. at 486, 564 A.2d at 495. Finally, the trial court's refusal to permit a criminal defendant to cross-examine a witness regarding the witness' use of drugs or alcohol on the day of the crime is reversible error and requires that the defendant be granted a new trial. *Commonwealth v. Dreibelbis, supra,* 217 Pa.Super. at 262, 269 A.2d at 390.

The Commonwealth asserts that the trial court did not err when it refused to allow the appellant to cross-examine the prosecution's witness regarding his possible alcohol consumption prior to making his observations. The Commonwealth reasons that evidence of drinking, by itself, is not sufficient to impeach a witness' testimony. In support of its argument, the Commonwealth cited two cases, *Commonwealth v. McGuire,* 302 Pa.Super. 226, 448 A.2d 609 (1982) and *In the Interest of Wright,* 265 Pa.Super. 278, 401 A.2d 1209 (1979).

In *Commonwealth v. McGuire, supra,* 302 Pa.Super. 226, 448 A.2d at 609, the defendant, a fact witness, was cross-examined regarding his alcohol consumption on the day of the assault. No objection was raised because, as defense counsel later stated, the questions were relevant to attack the credibility of the defendant-witness. However, the Commonwealth then questioned the defendant's wife on cross-examination about the defendant's alcohol consumption. Defense counsel properly objected to this line of questioning as exceeding the scope of direct examination. The trial court overruled the

objection and permitted the Commonwealth to continue. Based partially on this erroneous ruling, this Court reversed the judgment of sentence and remanded for a new trial, concluding that:

The only purpose of this question ... was to prejudice appellant by implanting in the minds of the jurors that appellant had been drinking on the day of the alleged offense ... This was clearly erroneous ... The Commonwealth ... improperly sought to strengthen the impact of its evidence by collateral and irrelevant matters....

*Id.*, 302 Pa.Super. at 233–34, 448 A.2d at 613. The Court did not hold, however, that as a fact witness the cross-examination of the defendant-witness concerning his own alcohol consumption was improper. Thus, *Commonwealth v. McGuire, supra,* 302 Pa.Super. at 226, 448 A.2d 609, is clearly not supportive of the Commonwealth's assertions in the instant case: (1) that the appellant's attempt at inquiry regarding fact witness Perez' alcohol consumption was unjustified and improper, and (2) that the trial court's refusal to permit that line of questioning was correct. Rather, the *McGuire* Court would allow a fact witness to be questioned on cross-examination about his or her alcohol consumption in order to place in evidence the witness' ability to observe and recall.

Next, the Commonwealth cited *In Interest of Wright, supra,* 265 Pa.Super. at 278, 401 A.2d 1209, where a panel of this Court stated:

[E]vidence of drinking is admissible only because it lays a foundation for an opinion of the intoxication of the witness. Intoxication, which numbs the faculties and thus affects the witness' ability to observe and recollect, is the evidence necessary to impeach a witness' credibility.

*Id.*, 265 Pa.Super. at 288–89, 401 A.2d at 1214 (citing *Commonwealth v. Godfrey,* 177 Pa.Super. 640, 644, 112 A.2d 434, 436 (1955) and 3A Wigmore, Evidence, § 933 (Chadbourn rev. 1970)). At trial, the witnesses in *Interest of Wright, supra,* 265 Pa.Super. at 278, 401 A.2d 1209, who were not fact witnesses, were not permitted to testify regarding their opinion of the amount of alcohol the victim consumed during that day. On appeal, this Court reversed the adjudication of delinquency and remanded the case for a new trial, holding that, because there was a proper foundation, the exclusion of

opinion testimony regarding the victim's intoxication was reversible error.

In the instant case, the Commonwealth argues that the appellant had no foundation for cross-examining Perez as to his consumption of alcohol. This statement is correct. However, unlike *In the Interest of Wright, supra,* 265 Pa.Super. 278, 401 A.2d 1209, we are not concerned with opinion testimony in this case and, therefore, are not concerned with the need for a proper foundation. We are concerned only with the ability of the fact witness to observe and recall the incident and with the fact witness' ability to accurately identify the perpetrators. Thus, both of the cases relied upon by the Commonwealth in support of the trial court's ruling to prohibit the appellant from cross-examining Perez regarding his possible consumption of alcoholic beverages on the night in question are clearly distinguishable from the instant case.

In addition, both at trial and when identifying the suspects, the eyewitness made several mistakes. First, he testified that he had observed three males, *one dark Hispanic and two white* males, attempting to break into a tavern by using bolt cutters on a gate lock. He stated that the three males fled in an automobile driven by a third white male. At the scene, the eyewitness identified a *black* male as one of the individuals attempting to burglarize the tavern. Then, at trial the eyewitness testified that two suspects were brought to the scene simultaneously and that he had identified them both at the same time. This testimony was directly contradicted by the two police officers who arrested the two suspects, the appellant and a *black* male. Each officer testified to a different estimated time of arrival at the scene. Further, each officer stated that neither one was present when the other officer arrived at the scene with the suspect whom he had apprehended in custody for identification by the eyewitness.

"Some of the most tragic miscarriages of justice have been due to testimonial errors in this field, the error being chiefly due to imperfect recollection, with the occasional further complication of defective perception and of suggestion." 3A Wigmore, Evidence, § 786a (Chadbourn rev. 1970). It is our conclusion that in the instant case the trial court abused its discretion by refusing to permit cross-examination regarding

Perez' possible alcohol consumption on the night in question. The accuracy of this eyewitness' identification was of the utmost importance, and the appellant should have been afforded the opportunity to explore whether the eyewitness' capacity to observe and recall had been impaired by alcohol. *See Commonwealth v. Drew, supra,* 500 Pa. at 585, 459 A.2d 318; *Commonwealth v. Yost, supra,* 478 Pa. at 337, 386 A.2d 961; *Commonwealth v. Ware, supra,* 459 Pa. at 334, 329 A.2d 258; *Commonwealth v. Perdue, supra,* 387 Pa.Super. at 473, 564 A.2d 489; *Commonwealth v. Duffy, supra,* 238 Pa.Super. at 161, 353 A.2d 50.[3]

Accordingly, we hold that the cross-examination of the Commonwealth's eyewitness, Perez, with regard to his consumption of alcohol on the evening of the incident, should not have been excluded; the exclusion of that line of cross-examination was an abuse of discretion and resulted in serious prejudice to the appellant. *See Commonwealth v. Dreibelbis, supra,* 217 Pa.Super. at 257, 269 A.2d 387; *Commonwealth v. Morrison, supra,* 157 Pa.Super. at 366, 43 A.2d 400. Hence, we would specifically overrule *Commonwealth v. Godfrey,* 177

---

**3.** *See also Commonwealth v. Spiewak,* 533 Pa. 1, 617 A.2d 696 (1992) (allowance or disallowance of questions on cross-examination is normally left to sound discretion of trial judge, but where limitations imposed by trial court upon cross-examination are such as plainly inhibit ability of accused to obtain a fair trial, general rule is manifestly inapplicable); *Cohen v. Albert Einstein Medical Center, Northern Division,* 405 Pa.Super. 392, 592 A.2d 720 (1991), *allocatur denied,* 529 Pa. 644, 602 A.2d 855 (1992) (evidence of mental illness or disability which impairs witness' ability to perceive, remember, and relate perceptions accurately is invariably admissible to impeach credibility); *Commonwealth v. Mason,* 358 Pa.Super. 562, 518 A.2d 282 (1986), *allocatur denied sub. nom. Commonwealth v. Miller,* 516 Pa. 640, 533 A.2d 711 (1987) (evidence that Commonwealth's witness had been diagnosed as paranoid schizophrenic was admissible for impeachment purposes, where witness, during period of commitment, had denied knowing mother and was said to have poor remote and immediate recall during commitment; failure to admit evidence constituted reversible error where only evidence connecting defendants to crimes were statements of Commonwealth's witness); *Commonwealth v. Dudley,* 353 Pa.Super. 615, 510 A.2d 1235 (1986), *allocatur denied,* 514 Pa. 634, 522 A.2d 1104 (1987) (abuse of discretion for trial court to exclude testimony as to alleged rape victim's hospitalization one month after incident, psychotic episode suffered two months after incident and six months before trial, hallucinations and mental instability; evidence was relevant to victim-eyewitness' capacity to observe, communicate, and recall events).

Pa.Super. 640, 112 A.2d 434 (1955) [4] which we conclude has been overruled *sub silentio* by *Commonwealth v. Drew, supra,* 500 Pa. at 585, 459 A.2d 318; *Commonwealth v. Yost, supra,* 478 Pa. at 327, 386 A.2d 956; and *Commonwealth v. Ware, supra,* 459 Pa. at 334, 329 A.2d 258; and we reverse the order adjudicating the appellant delinquent and remand the case for a new hearing.

Reverse and remand for a new hearing.

WIEAND, McEWEN, and BECK, JJ., join.

BECK, J., also files a Dissenting Statement.

BECK, Judge, dissenting:

I join in the Opinion authored by my colleague Judge Kelly and write separately to address the concern raised by Judge Cirillo that allowance of this type of questioning results in our approval of defense counsel going on a "fishing expedition."

The record reveals that the district attorney objected to and the trial judge refused to allow *any* questions relating to the witness's consumption of alcohol on the evening in question. Defense counsel's questions, i.e., "Had you had anything to drink that evening?" and "Had you been to any bars?" went directly to a crucial and elementary issue on cross-examination, that is, the witness's ability to observe what he claimed to have observed. Since this case was based primarily on the witness's identification of appellant and, as discussed in the

---

4. In *Commonwealth v. Godfrey, supra,* 177 Pa.Super. at 640, 112 A.2d 434, the defendant attempted to attack a fact witness' credibility by cross-examining the witness "as to whether or not she had consumed alcoholic drinks" earlier in the evening prior to the automobile accident about which she was testifying. The trial court sustained an objection to this question and would not permit any further inquiry along this line. On appeal, this Court held that the trial court committed no error in sustaining the objection to this line of questioning. In support of its holding, the Court cited *Commonwealth v. Rouchie,* 135 Pa.Super. 594, 7 A.2d 102 (1939). However, we conclude that this Court's reliance in *Commonwealth v. Godfrey* upon *Commonwealth v. Rouchie* was misplaced. In *Commonwealth v. Rouchie, supra,* the defendant attempted to solicit a lay witness' *opinion* regarding whether a Commonwealth witness was intoxicated at the time of the alleged assault and battery. In *Commonwealth v. Godfrey, supra,* 177 Pa.Super. at 640, 112 A.2d 434, a fact witness was questioned about her own ingestion of alcohol on the night in question and was not asked to render an opinion as to someone else's intoxication. Thus, we conclude that *Commonwealth v. Godfrey, supra,* was wrongly decided.

dissenting opinion, that identification contained some inconsistencies, it was appropriate to allow cross-examination on the possible cause for the inconsistencies.

Allowing such questioning does not mean we open the floodgates to a series of irrelevant or collateral issues which do no more than inject prejudice into the proceedings. In addition to the Commonwealth's ability to rehabilitate a witness, the trial judge has the power to avoid possible prejudice by promptly curtailing questioning that is "going nowhere." This is especially true in a juvenile proceeding where there is no jury present.

Based on the analysis made in the dissenting opinion, I believe that appellant was entitled to challenge the witness's ability to observe by asking preliminary questions regarding alcohol intake. Should the answers to those questions provide a basis for further questioning along that line, such should be permitted. Where those answers do nothing to support defense counsel's position, the questioning should be terminated by the trial court.